¶ 1.
REBECCA GRASSL BRADLEY, J.
The court of appeals certified this case to the court to determine whether the admission of a toxicology report through a medical examiner's testimony violated Rozerick E. Mattox's Sixth Amendment right to confrontation. After a bench trial,[1] Mattox was convicted of first-degree reckless homicide for delivering heroin that caused S.L.'s death.[2] Specifically, the certified question asks:
Does it violate a defendant's rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution for the State to introduce at trial a toxicology report identifying certain drugs in a deceased victim's system and/or testimony of a medical examiner basing his/her cause-of-death opinion in part on the information set forth in such a report, if the author of the report does not testify and is not otherwise made available for examination by the defendant?
f 2. The certification explains that two recent court of appeals decisions reached opposite conclusions in heroin overdose homicide cases involving toxicology reports. See State v. Heine, 2014 WI App 32, 354 Wis. 2d 1, 844 N.W.2d 409; State v. VanDyke, 2015 WI App 30, *127 361 Wis. 2d 738, 863 N.W.2d 626. During the underlying trials in both Heine and VanDyke, the toxicology reports were used during testimony by the medical examiners who performed the autopsies and relied on the toxicology reports to determine the cause of death in each case. The lab analyst who signed the toxicology reports did not testify. In Heine, the court of appeals held the toxicology report could be used without violating the confrontation right. Id., 354 Wis. 2d 1, ¶¶ 1,15. But in VanDyke, it held the toxicology report was "testimonial"; therefore, according to the court of appeals, the report's admission through the medical examiner's testimony violated the Confrontation Clause under Crawford v. Washington, 541 U.S. 36 (2004) (admission of "testimonial" out-of-court statements without affording the defendant the opportunity to cross-examine the declarant violates the Confrontation Clause). VanDyke, 361 Wis. 2d 738, ¶¶ 14-17. The certification notes that neither party in Heine nor VanDyke sought review in this court but that "a supreme court decision could lay this issue to rest for the bench and bar."
¶ 3. We answer the certified question in the negative and therefore overrule VanDyke. Admitting this type of toxicology report and the medical examiner's related testimony does not violate a defendant's confrontation right because the toxicology report was not "testimonial" under the primary purpose test recently set forth by the United States Supreme Court in Ohio v. Clark, 135 S. Ct. 2173 (2015). Under that test, when the statement's primary purpose is something other than to "creat[e] an out-of-court substitute for trial testimony" its admission does not implicate the *128 Confrontation Clause. Id. at 2180, 2183 (quoting Michigan v. Bryant, 562 U.S. 344, 358 (2011)).
f 4. The primary purpose of the toxicology report in this case was to assist the medical examiner in determining the cause of death. All objective indicators show the report was not created for an evidentiary purpose: (1) the medical examiner testified she requested the toxicology analysis as a part of her autopsy protocol; (2) the toxicology report was not sworn, certified, or in the form of an affidavit and it comprised only numerals quantifying the concentration of substances contained in S.L.'s blood, urine, and tissue samples without any analysis or interpretation of those numbers; (3) the police were not involved in the autopsy or toxicology requests; (4) the report was not requested by or reported directly to law enforcement; (5) according to the record, the analyst who signed the report had no knowledge the report related to a crime; and (6) the report did not give an opinion on the cause of death or any element of the crime for which Mattox was charged. Accordingly, the admission and use at trial of this toxicology report did not violate Mattox's Sixth Amendment right to confrontation.[3] We affirm the judgment convicting Mattox.
I. BACKGROUND
¶ 5. At about 2:30 a.m. on February 15, 2013, S.L.'s roommate wanted to talk to S.L. and tried to get S.L. to open his locked bedroom door. After receiving no response, the roommate broke open the door to the bedroom, where he found S.L. deceased.
*129 ¶ 6. City of Waukesha police and a Waukesha County deputy medical examiner came to the apartment. They found S.L. hunched over on the bedroom floor with drug paraphernalia on a chair nearby. They also found some non-prescription ibuprofen and prescription Clonazepam, a drug used to treat anxiety. Waukesha County Deputy Medical Examiner, Nichol Wayd, spoke with police at the scene to get background facts, took pictures, and transported S.L.'s body to the morgue for an autopsy.
f 7. After the body was removed from the scene, the police, under the supervision of City of Waukesha Detective Thomas Casey, collected the drug paraphernalia from S.L.'s room, including multiple syringes (one of which had been used recently), a small metal cooker, a tourniquet, and some cotton balls. These items were submitted to the State Crime Lab for analysis.
¶ 8. On February 15, 2013, Dr. Zelda Okia, an associate medical examiner for Waukesha County, performed the autopsy on S.L.'s body in order to determine the cause of death. The autopsy protocol included examining the body and collecting and sending biological samples to a toxicology lab. The Waukesha County Medical Examiner's Office used the St. Louis University toxicology lab because a board certified toxicologist runs the lab and Waukesha County does not have the equipment to conduct its own toxicology tests. During the autopsy, Dr. Okia noted pulmonary edema, cerebral edema, 13 recent needle puncture marks in S.L.'s arms, and elevation in the weight of his lungs—all signs indicating death caused by drug overdose. Dr. Okia collected samples of S.L.'s blood, urine, and tissue near the injection sites, as well as one control tissue sample. She sent these samples to the toxicology lab with the following information: (1) S.L.'s name, age, weight, *130 and race; (2) a history reading "Found unresponsive at Home"; (3) a listing of medications available as "Clon-azepam, Ibuprofen"; and (4) a request to "Please test all above specimens" for "Alcohol" and "General Unknown." The lab received the specimens on February 19, 2013, and the toxicology report was completed on March 13, 2013.
f 9. The toxicology report, which is attached in the Appendix, lists the substances for which each sample was tested, as well as either the word "negative" or "positive." A number appears next to any substance identified within the sample. As pertinent here, the toxicology report indicates the following:
The blood sample contained:
• "0.61 MICROGRAMS/ML" of total morphine;
• "LESS THAN 0.05 MICROGRAMS/ML" of '' 6-MONOACETYLMORPHINE'[1]; and
• "0.27 MICROGRAMS/ML" of free morphine.
The urine sample contained:
• "0.74 MICROGRAMS/ML" of codeine;
• "GREATER THAN 4 MICROGRAMS/ML" of morphine;
• "2.5 MICROGRAMS/ML" of "6-MONOACETYL-MORPHINE"; and
• "0.13 MICROGRAMS/ML" of hydromorphone.
The tissue samples, including the control sample, all contained measurable amounts of morphine:
• "0.28 MICROGRAMS/GM" in "Antecubital vein and fat";
*131 • "0.14 MICROGRAMS/GM" in "Right anterior forearm vein and fat";
• "0.16 MICROGRAMS/GM" in "Right ventral forearm vein and fat";
• "0.11 MIRCROGRAMS/GM" in "Right anterior forearm vein and fat"; and
• "0.14 MIRCROGRAMS/GM" in "Left antecubital vein and fat."
Dr. Christopher Long signed the toxicology report but the report was not sworn or certified and does not contain any affidavit-like assertions. The report does not explain the significance of any of the numbers nor does it provide an interpretation of the chemical levels.
¶ 10. Upon receiving the toxicology report, Dr. Okia completed her autopsy report. Although the autopsy report is not dated, it must have been completed after March 13, 2013, because it lists the blood sample morphine quantities from the toxicology report. Dr. Okia's autopsy report concludes that S.L.'s cause of death was "Acute Heroin Intoxication." The autopsy report does not indicate any police involvement with the autopsy or the toxicology lab. The police were not involved in requesting, sending, or receiving the biological samples from or to the toxicology lab.
¶ 11. The City of Waukesha Police investigation into S.L.'s death proceeded independently from the county medical examiner's office. The only connection in this record between the medical examiner's office and the police is the fact that both responded to the scene and together notified S.L.'s next of kin of his death. Dr. Wayd also sent to police her investigative report, which is required in all State investigations and routinely produced. The report contains a sum *132 mary of the medical examiner's observations from the scene and it documents the notification of S.L.'s next of kin regarding his death.
¶ 12. The independent police investigation resulted in a conclusion by law enforcement that S.L. died from an overdose of heroin supplied by Mattox. The State Crime Lab certified, in an October 2013 report, that the recently used syringe and metal cooker police collected from S.L.'s apartment tested positive for the presence of heroin. Cell phone and financial records, bank video surveillance, and interviews with S.L.'s family and friends enabled police to retrace S.L.'s steps the day before his death. This led police to S.L.'s friend, Terry Tibbits. Ten days after S.L.'s death, the police spoke with Tibbits, who admitted he helped S.L. buy heroin from Mattox mid-morning on February 14, 2013. Video surveillance from a bank ATM confirmed Tibbits' report that the two withdrew $100 from S.L.'s bank account shortly before meeting with Mat-tox. Tibbits told police he gave $80 of S.L.'s ATM withdrawal to Mattox in exchange for a half gram of heroin. After the heroin purchase, Tibbits and S.L. immediately used 25 percent of the half gram, and S.L. kept the rest. The police learned from Tibbits that he regularly bought heroin from Mattox, a fact police confirmed when Tibbits arranged for a controlled buy of heroin from Mattox on March 8, 2013. After the controlled buy, police arrested Mattox for selling heroin. During police questioning, Mattox admitted he sold Tibbits heroin two to three times a week, but claimed he did not remember whether Tibbits bought heroin from him on February 14, 2013.
f 13. The police obtained cell phone records for Tibbits, Mattox, and S.L., which supported the details Tibbits told police. From additional interviews with *133 S.L.'s family and friends, police learned that S.L. was a heroin addict, had been arrested for heroin possession earlier that month, and had a court appearance related to that arrest the afternoon of February 14, 2013. Police also learned that S.L.'s regular heroin supplier was in jail and S.L. had been trying to stop using heroin.
f 14. After being charged in April 2013 with reckless homicide for S.L.'s death, Mattox pled not guilty and the case was tried to the court. At trial, Mattox did not deny that he regularly sold heroin to Tibbits, but he insisted he had not done so on February 14, 2013. He did not dispute that S.L. died from ingesting heroin; rather, he argued that S.L. bought the deadly heroin from some other heroin dealer.
¶ 15. At trial, Dr. Okia explained the autopsy procedure in a suspected overdose situation where the cause of death is unknown. The procedure requires collecting biological specimens to be sent to the toxicology lab for analysis. When the prosecutor asked Dr. Okia about the toxicology report, Mattox objected to its admission on the grounds that it violated his right to confrontation.[4] The circuit court overruled the objection, holding that the toxicology report was admissible under Wis. Stat. § 907.03 (2011-12)[5] as a basis for expert opinion testimony and because it was not being *134 admitted for its truth or to prove an element of the crime. The circuit court limited the admission of the report accordingly.
f 16. Dr. Okia testified that her cause of death determination was based on her observations made during the autopsy as well as the toxicology results she reviewed. She testified:
• 0.61 micrograms per milliliters of morphine in the blood is a fatal amount; although the toxicology report did not state this, she knew it from her training and experience.
• Less than 0.05 micrograms per milliliters of 6-monoacetylmorphine (6-MAM for short) in the blood is specific for heroin; it means the morphine in the blood came from heroin and could not have come from any other substance.
• 0.27 micrograms per milliliters of free morphine in the blood is "actual active morphine" and is a fatal amount; the toxicology report did not explain this but she knew it from her training and experience.
1 17. Dr. Okia also testified about the other numbers in the toxicology report. She explained that the codeine in S.L.'s urine is a contaminant often found in heroin cases because codeine is used to manufacture heroin. She further explained, however, that substances detected in urine indicate the presence of the substances but cannot be used to determine the cause of death because "urine typically concentrates the drugs." She looks only for "active drugs in the blood" in assessing cause of death.
f 18. The circuit court found Mattox guilty. He appealed to the court of appeals, claiming that admission of the toxicology report, without testimony at trial *135 by the analyst who signed it, violated his right to confrontation. The court of appeals certified the case to this court, and we accepted it for review.
II. ANALYSIS
A. Standard of Review
¶ 19. Whether the admission of the toxicology report and the medical examiner's testimony based upon it violates Mattox's Sixth Amendment right to confrontation is a question of constitutional law subject to independent review. See State v. Williams, 2002 WI 58, ¶ 7, 253 Wis. 2d 99, 644 N.W.2d 919.
¶ 20. Both the Sixth Amendment to the United States Constitution and the Wisconsin Constitution guarantee a criminal defendant the right to confront witnesses who testify against the defendant at trial. See U.S. Const, amend. VI; Wis. Const. art. 1, § 7.[6] "We generally apply United States Supreme Court precedent when interpreting these clauses." State v. Jensen, 2007 WI 26, ¶ 13, 299 Wis. 2d 267, 727 N.W.2d 518 (2007).
B. Precedent
f 21. This case presents an issue of first impression that neither this court nor the United States Supreme Court has directly addressed. Since the Su *136 preme Court decided Crawford v. Washington, 541 U.S. 36 (2004), we have issued only two opinions involving the application of the Confrontation Clause to forensic lab reports, and neither opinion involved a toxicology report requested by the medical examiner as a part of an autopsy to determine the cause of death where a crime had not yet been uncovered. See State v. Griep, 2015 WI 40, 361 Wis. 2d 657, 863 N.W.2d 567; State v. Deadwiller, 2013 WI 75, 350 Wis. 2d 138, 834 N.W.2d 362.
f 22. Griep involved a drunk-driving prosecution where an expert witness relied on a blood alcohol lab report certified by an analyst who was not available to testify at trial. The report was not admitted, but an expert witness reviewed the lab report and testified about the blood alcohol result it reported. We held Griep's confrontation right was not violated because the expert merely reviewed the lab report to form an independent opinion to which the expert testified. See Griep, 361 Wis. 2d 657, ¶¶ 1-3. The holding in Griep did not depend on whether the report itself was testimonial because the report was not admitted into evidence.
¶ 23. Deadwiller involved a sexual assault prosecution where an expert witness used a DNA profile created by an out-of-state lab using vaginal and cervical swabs from the victim to form an independent conclusion. Deadwiller, 350 Wis. 2d 138, ¶¶ 1, 40. Deadwiller challenged the testimony of the State Crime Lab analyst who entered the DNA profile into the DNA database and found it matched Deadwiller. Id., ¶ 40. Relying on Williams v. Illinois, 567 U.S. 50, 132 S. Ct. 2221 (2012), a plurality opinion with facts substantially identical to those in Deadwiller, we determined no confrontation violation occurred. Dead- *137 wilier, 360 Wis. 2d 138, ¶¶ 1-2. Significantly, the defendant in Deadwiller did not contest the very fact supported by the DNA profile—that he had intercourse with the victims—rather, the defendant testified that the victims consented. Id., ¶ 36. Neither Griep nor Deadwiller is squarely on point here.
| 24. Likewise, the Supreme Court has not yet addressed the issue presented in this case. Unquestionably, the Court substantially changed confrontation jurisprudence when it decided Crawford in 2004. See Clark, 135 S. Ct. at 2179. The Crawford Court overruled the Confrontation Clause test articulated in Ohio v. Roberts, 448 U.S. 56 (1980), which had allowed admission of out-of-court statements exhibiting "adequate indicia of reliability" if the statement either fell "within a firmly rooted hearsay exception" or bore "particularized guarantees of trustworthiness." See Crawford, 541 U.S. at 40; Clark, 135 S. Ct. at 2179 (quoting Roberts, 448 U.S. at 66). Crawford returned confrontation law to its original meaning and held a defendant's right to confrontation is violated if the trial court receives into evidence out-of-court statements by someone who does not testify at the trial if those statements are "testimonial" and the defendant has not had "a prior opportunity" to cross-examine the out-of-court declarant. Crawford, 541 U.S. at 68. The Crawford Court did not provide a comprehensive definition of "testimonial," but it concluded that, "at a minimum," "testimonial" statements include "prior testimony at a preliminary hearing, before a grand jury, or at a former trial and.. . police interrogations" because these are the types of evidence "at which the Confrontation Clause was directed." Id. Crawford's definition of "testimonial" required the statement to have some degree of formality. *138 See id. at 51. Post-Crawford, confrontation challenges begin with an analysis of whether the out-of-court statements used against a defendant are "testimonial." If the statements are not testimonial, the Confrontation Clause is not implicated.
f 25. Since Crawford, the Supreme Court decided several confrontation cases in a variety of contexts and further defined whether statements are or are not "testimonial." See Davis v. Washington, 547 U.S. 813, 822 (2006) (establishing that statements "are nontesti-monial when made .. . under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency" (emphasis added)); Melendez-Diaz v. Massachusetts, 557 U.S. 305, 310-11 (2009) (concluding that affidavit-like certifications, which proved the fact in question—that a seized substance was cocaine—were testimonial because they were "functionally identical to live, in-court testimony, doing 'precisely what a witness does on direct examination'" (quoting Davis, 547 U.S. at 830)); Michigan v. Bryant, 562 U.S. 344, 377-78 (2011) (holding that statements made by a dying shooting victim were nontestimonial where informal nature of police questioning demonstrated officers' primary purpose of assessing the situation and responding to ongoing emergency); Bullcoming v. New Mexico, 564 U.S. 647, 664-65 (2011) (treating a lab report regarding defendant's blood-alcohol content as testimonial because, despite the absence of notarization, the author's certification was a formal, signed report "created solely for an 'evidentiary purpose'. . . [and] made in aid of a police investigation" (quoting Melendez-Diaz, 557 U.S. at 311)); Williams v. Illinois, 567 U.S. 50, 132 S. Ct. 2221, 2243 (2012) (plurality opinion) (concluding that DNA profile generated from sexual assault victim's *139 vaginal swabs was not testimonial because its "primary-purpose . . . was not to accuse [the suspect] or to create evidence for use at trial"); Ohio v. Clark, 135 S. Ct. 2173, 2181 (2015) (determining that child abuse victim's statements to teacher were not testimonial because the informal questions at a school were asked with a primary purpose as a "concerned citizen . .. talking] to a child who might be the victim of abuse," not "to gather evidence for . . . prosecution").
C. Application
¶ 26. Three of these Supreme Court cases discussed the Confrontation Clause within the context of forensic lab reports: Melendez-Diaz, Bullcoming, and Williams. Melendez-Diaz involved cocaine drug dealing where the challenged evidence comprised "affidavits reporting the results of forensic analysis which showed that material seized by the police and connected to the defendant was cocaine." Melendez-Diaz, 557 U.S. at 307-08. Bullcoming involved a drunk-driving arrest where the forensic lab report was created at the request of and for the "aid of a police investigation," "solely for an 'evidentiary purpose.' " Bullcoming, 564 U.S. at 651, 664 (quoting Melendez-Diaz, 551 U.S. at 311). The lab report certified Bullcoming's blood-alcohol concentration, the chain of custody of the blood sample, the qualifications of the analyst, the lab procedures, and that all procedures had been followed. Id. at 653. The Court held both lab reports were testimonial and their admission, without the opportunity to cross-examine the authors, violated the Confrontation Clause. See Melendez-Diaz, 557 U.S. at 311; Bullcoming, 564 U.S at 663-65.
¶ 27. Melendez-Diaz and Bullcoming do not control here because the lab report and its evidentiary use *140 in Mattox's case bear no resemblance to the reports or their use in Melendez-Diaz or Bullcoming. First, the forensic reports in Melendez-Diaz and Bullcoming were requested by police following the seizure of evidence from a criminal suspect, and the lab reports were specifically created for use against the suspects in criminal prosecutions. See Melendez-Diaz, 557 U.S. at 310-11; Bullcoming, 564 U.S. at 651, 664-65. Second, the Melendez-Diaz and Bullcoming reports satisfied the formality factor because each report was affidavit-like or certified—providing the functional equivalent of trial testimony—significantly, about an element of the crime in each case. In Melendez-Diaz, the Supreme Court concluded that "[t]he Sixth Amendment does not permit the prosecution to prove its case via ex parte out-of court affidavits." Melendez-Diaz, 557 U.S. at 329.
f 28. Here, the medical examiner took biological samples during an autopsy of a decedent who died of unknown causes. The police did not seize the tested evidence from Mattox, who was not suspected of committing a crime when the samples were taken. The toxicology report was not requested by the police or solicited for the purpose of generating evidence against Mattox. At the time the medical examiner sent the samples for testing, there was no defendant against whom to generate evidence because there was no known crime. The medical examiner was simply looking for information to determine the cause of death and submitted the biological samples to the toxicology lab pursuant to autopsy protocols. The police were not involved in sending the samples to the lab or generating evidence against a defendant with respect to the autopsy, and the record is devoid of any suggestion that the medical examiner was working as an agent of the police in an active criminal investigation to develop evidence for use in a criminal prosecution.
*141 ¶ 29. Further, the toxicology report in this case lists the concentration of the various substances present in S.L.'s biological samples sent for testing. The numbers in the report relate to S.L., not Mattox. Unlike in Melendez-Diaz and Bullcoming, the analyst who signed the report was not acting as a witness against Mattox and was not offering testimony with the primary purpose of saying that the heroin Mattox sold to S.L. killed him. The toxicology report does not even contain the word "heroin," and the report does not accuse Mattox of anything. Based on these significant differences, Melendez-Diaz and Bullcoming are easily distinguishable.
¶ 30. Williams is the third Supreme Court case addressing confrontation rights where a forensic lab report was used at trial without the testimony of the author of the report. The Williams case involved a sexual assault where the defendant claimed that use of a DNA profile violated his confrontation rights. See Williams, 132 S. Ct. at 2227. A four-Justice plurality concluded the DNA report was not testimonial because it had been prepared not "for the primary purpose of accusing a targeted individual" but to "catch a dangerous rapist who was still at large." Id. at 2243. Because Williams does not have precedential value except in a case with substantially similar facts, it does not apply here. See Griep, 361 Wis. 2d 657, ¶ 39.
¶ 31. Thus, none of the Supreme Court's confrontation cases specifically discuss the Confrontation Clause within the context of the issue presented here: whether a toxicology report—prepared at the medical examiner's request as a part of the autopsy protocol in a drug overdose death—constitutes testimony in a homicide prosecution against the dealer who supplied the heroin responsible for the fatal overdose.
*142 ¶ 32. Ohio v. Clark, 135 S. Ct. 2173, guides our review. Although Clark did not involve a toxicology report prepared as a part of an autopsy, it pronounces the controlling principles in determining whether an out-of-court statement is "testimonial" and therefore subject to the Confrontation Clause. Clark reaffirms the primary purpose test: the dispositive "question is whether, in light of all the circumstances, viewed objectively, the 'primary purpose' of the [out-of-court statement] was to creat[e] an out-of-court substitute for trial testimony." Clark, 135 S. Ct. at 2180 (quoting Bryant, 562 U.S. at 358). The primary purpose test decides whether the declarant is acting as a witness against the defendant, see Clark, 135 S. Ct. at 2185 (Scalia, J., concurring), by considering whether the primary purpose of the out-of-court statement "was to gather evidence for [the defendant's] prosecution." Id. at 2181. Clark instructs that some factors relevant in the primary purpose analysis include: (1) the formality/ informality of the situation producing the out-of-court statement; (2) whether the statement is given to law enforcement or a non-law enforcement individual; (3) the age of the declarant[7] and (4) the context in which the statement was given. Id. at 2180-82.
¶ 33. In order to decide whether the declarant in this case—the analyst who signed the toxicology report —was acting as a witness against Mattox, we must apply the primary purpose test. We start by examining the purpose of the toxicology report. Dr. Okia testified that, as a routine part of her autopsy protocol in *143 suspected overdose cases, she collects biological specimens and sends them to the toxicology lab for testing to determine what substances, if any, are present in a decedent's blood, urine, and tissue. The reason for the testing is to inform the medical examiner's opinion as to the cause of death. Thus, the primary purpose of the toxicology report here was to provide information to the medical examiner as part of the autopsy protocol, not to establish certain toxicology levels in order to prove an element of a criminal charge. Indeed, no charges were pending or contemplated against Mattox at the time the medical examiner requested this toxicology report. Because the toxicology report was not intended to substitute for testimony in a criminal prosecution, the report's primary purpose very clearly is not testimonial.
f 34. Another factor to consider in making the primary purpose determination is the "informality of the situation." Clark, 135 S. Ct. at 2180 (quoting Bryant, 562 U.S. at 377). A formal out-of-court statement is considered more likely to be testimonial, and an informal one is considered less likely to be testimonial. As a part of this analysis, Clark looked at whether the statements at issue were given to law enforcement officers or non-law enforcement individuals. Id. at 2181. Clark stopped short of adopting a "categorical rule" that statements to non-law enforcement individuals will never implicate the Confrontation Clause, but the Court held that statements to persons other than law enforcement officers were "much less likely to be testimonial than statements to law enforcement officers." Id. The toxicology report at issue in Mattox's case was not prepared for or given to law enforcement, making it much less likely to be testimonial. Although the toxicology report is "formal" in the sense that it is *144 typewritten, titled, and signed, this slight formality does not imply a testimonial purpose in a way that traditionally formal attestations, such as notarization or certification, might.
¶ 35. The facts in the record provide additional context, which Clark teaches is "highly relevant" to the primary purpose analysis in confrontation cases. See Clark, 135 S. Ct. at 2182. The declarant created the report at the request of the medical examiner, not the police, to provide the medical examiner with the numerical concentration of substances, if any, present in the decedent's biological samples. The report was generated to help the medical examiner determine S.L.'s cause of death, not to help the police produce evidence for a criminal prosecution. Nothing in the record suggests the declarant knew that the police were conducting a simultaneous investigation into S.L.'s death or that the police would eventually conclude that a crime occurred. To the contrary, the information provided to the toxicology lab declarant gave no indication that S.L.'s death would prompt a homicide prosecution or that police were involved in any way. The specimens came from the medical examiner's office with information that S.L. was found "unresponsive at home" with Clonazepam and ibuprofen nearby. Under Wis. Stat. §§ 979.02 and 979.04, a medical examiner has broad, independent discretion to conduct an autopsy "for the purpose of inquiring how the person died" if there are "unexplained or suspicious circumstances" accompanying the death, see also Scarpaci v. Milwaukee Cty., 96 Wis. 2d 663, 684, 292 N.W.2d 816 (1980), and, as the State points out, homicides account for "less than one percent" of the *145 1300 deaths the Waukesha County Medical Examiner's Office investigates each year.
¶ 36. Context shows the primary purpose of the toxicology report was to provide the medical examiner with the results of tests performed on the biological specimens of an individual who died for unknown reasons. It was not to aid police in a criminal investigation or to prove an element of a later-charged crime; it was not created as a substitute for out-of-court testimony to prove Mattox killed S.L. Mattox did not dispute any fact conveyed by the toxicology report, instead basing his defense on the theory that S.L. bought the heroin that killed him from another dealer. A toxicology report used as a partial foundation for a medical examiner's cause of death determination—a report lacking any accusation or basis therefor against the defendant—is not the type of evidence "at which the Confrontation Clause was directed." See Crawford, 541 U.S. at 68.
¶ 37. Applying all the pertinent Clark factors in this case results in a single conclusion: the toxicology report in this case was not "testimonial" because its primary purpose was to identify the concentration of the tested substances in biological samples sent by the medical examiner as a part of her autopsy to determine the cause of death—not to create a substitute for out-of-court testimony or to gather evidence against Mattox for prosecution. Use of this toxicology report during trial did not infringe Mattox's confrontation right.
D. General Declaration on Autopsies and Toxicology Reports
¶ 38. The State asks this court to declare that, in general, admitting autopsy reports and any underlying *146 toxicology reports will not violate a defendant's confrontation right because these types of reports do not generate testimonial evidence. The State asserts this is so because the primary purpose of autopsies is to determine cause of death and not to generate evidence against a criminal defendant. Although the Supreme Court has not declared this to be the law, the State cites a variety of court decisions supporting its proposition. See United States v. James, 712 F.3d 79, 87-102 (2d Cir. 2013) ("autopsy report was not testimonial because it was not prepared primarily to create a record for use at a criminal trial"); People v. Leach, 2012 IL 111534, ¶¶ 76-138, 980 N.E.2d 570 (autopsy report not testimonial because it was not "prepared for the primary purpose of accusing a targeted individual" or for "providing evidence in a criminal case" (citations omitted)); State v. Maxwell, 2014-Ohio-1019, ¶¶ 54-65, 9 N.E.3d 930 (autopsy reports are not testimonial because "they are created 'for the primary purpose of documenting cause of death for public records and public health' " (quoting Carolyn Zabrycki, Comment, Toward a Definition of "TestimonialHow Autopsy Reports Do Not Embody the Qualities of a Testimonial Statement, 96 Calif. L. Rev. 1093, 1130 (2008))). The State acknowledges that some courts have held autopsies "testimonial," but the State asserts this occurred only under special circumstances, such as when law enforcement is physically present at the autopsy or leans heavily on the medical examiner to produce reports favoring prosecution against a criminal defendant. See, e.g., United States v. Moore, 651 F.3d 30, 73 (D.C. Cir. 2011) (ruling autopsy report testimonial where police "observed the autopsies" and "participated in the creation of reports"); State v. *147 Navarette, 294 P.3d 435, 440 (N.M. 2013) (ruling autopsy report testimonial where "two police officers attended the autopsy").
f 39. We decline the State's request. The medical examiner who performed the autopsy in this case testified at trial, eliminating any confrontation argument with respect to the autopsy report itself. A declaration on autopsies is not presented under the circumstances in this case.
¶ 40. We do declare a general rule with respect to the type of toxicology report at issue here. When a medical examiner—unilaterally and not in conjunction with law enforcement—requests a toxicology report while performing an autopsy to determine the cause of death, admitting the toxicology report generally will not violate the Confrontation Clause when the toxicology report contains solely a numerical account of the concentration of substances within a decedent's blood, urine, and tissue. The primary purpose of toxicology reports generated and used under circumstances similar to those presented in this case is not to generate evidence against a defendant in a criminal prosecution but to assist the medical examiner in determining the cause of death. Because admission of this type of toxicology report bears no "resemblance to the historical practices that the Confrontation Clause aimed to eliminate,"[8] such reports generally will not be "testimonial" and therefore will not trigger confrontation concerns.
III. CONCLUSION
¶ 41. This case presented an issue of first impression: whether an out-of-state toxicology report re *148 quested by a medical examiner as a part of the routine autopsy protocol in a drug overdose death constitutes testimonial evidence in the resulting homicide prosecution against the drug dealer who supplied the heroin responsible for the fatal overdose. Guided by the Supreme Court's most recent confrontation case, Ohio v. Clark, 135 S. Ct. 2173, which requires application of the "primary purpose" test, we conclude the toxicology report here is not "testimonial" and its use at trial therefore did not infringe upon Mattox's confrontation right. We overrule the court of appeals' decision in State v. VanDyke, 361 Wis. 2d 738, because the court of appeals erroneously held a substantially similar toxicology report to be "testimonial." Id., f 17.
f 42. We decline the State's request to declare all autopsy reports, absent special circumstances, to be non-testimonial because that is not the issue presented here. We do, however, hold that all toxicology reports similar to the one here—solely identifying the concentration of substances present in biological samples sent by the medical examiner as a part of an autopsy protocol—are generally non-testimonial when requested by a medical examiner and not at the impetus of law enforcement. The primary purpose of these toxicology reports is not to create evidence against a defendant in a criminal prosecution; rather, the principal purpose is to provide information to the medical examiner searching for the cause of death. Because there was nothing "testimonial" about the toxicology report used during Mattox's trial, the confrontation rights of the defendant were not infringed.
By the Court.— The judgment of the circuit court is affirmed.
*149 APPENDIX
[[Image here]]
*150 [[Image here]]
*151 [[Image here]]

 The Honorable Jennifer R. Dorow of Waukesha County presided.

 Mattox was convicted under Wis. Stat. § 940.02(2)(a)(2011-12), which defines first-degree reckless homicide in pertinent part as: "Whoever causes the death of another human being... [b]y manufacture, distribution or delivery, in violation of s. 961.41, of a controlled substance ... if another human being uses the controlled substance . . . and dies as a result of that use."

 Mattox does not raise any other ground for possible exclusion of the toxicology report; thus, our review is limited to whether its admission violated the Confrontation Clause.

 Mattox did not object to the admission of the lab reports finding the presence of heroin on the drug paraphernalia collected from S.L.'s bedroom and finding that the substance seized during the March 8, 2013 controlled drug buy was heroin. He stipulated to the admission of those Wisconsin State Crime Lab reports without requiring the lab analysts to testify at trial.

 All subsequent references to the Wisconsin Statutes are to the 2013-14 version unless otherwise indicated.

 The Sixth Amendment to the United States Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right... to be confronted with the witnesses against him. . . ." Article I, Section 7 of the Wisconsin Constitution states: "In all criminal prosecutions the accused shall enjoy the right... to meet the witnesses face to face . . .."

 This factor, though pertinent in Ohio v. Clark, 135 S. Ct. 2173, 2181 (2015), is not applicable here and will not be discussed.

 Michigan v. Bryant, 562 U.S. 344, 379 (2011) (Thomas, J., concurring in the judgment).

 State v. Deadwiller, 2013 WI 75, ¶ 47, 350 Wis. 2d 138, 834 N.W.2d 362 (Abrahamson, C.J., concurring).