# COURT OF APPEALS OF WISCONSIN
## PUBLISHED OPINION

Case No.:        2019AP1573-CR

† Petition for Review filed

Complete Title of Case:

**STATE OF WISCONSIN,**

    **PLAINTIFF-RESPONDENT,**

        **V.**

    **PATRICK A. KELLER,**

        **DEFENDANT-APPELLANT.†**

---

| | |
|---|---|
| Opinion Filed: | March 3, 2021 |
| Submitted on Briefs: | October 27, 2020 |

---

| | |
|---|---|
| JUDGES: | Neubauer, C.J., Reilly, P.J., and Gundrum, J. |
| Concurred: | |
| Dissented: | |

---

| | |
|---|---|
| Appellant ATTORNEYS: | On behalf of the defendant-appellant, the cause was submitted on the briefs of *Bradley J. Lochowicz* of *Lochowicz & Venema LLP*, Elkhorn. |
| Respondent ATTORNEYS: | On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Sara Lynn Shaeffer*, assistant attorney general, and *Joshua L. Kaul*, attorney general. |

## COURT OF APPEALS
## DECISION
## DATED AND FILED

### March 3, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No. 2019AP1573-CR**

**STATE OF WISCONSIN**

Cir. Ct. No. 2016CF449

**IN COURT OF APPEALS**

---

STATE OF WISCONSIN,

   PLAINTIFF-RESPONDENT,

V.

PATRICK A. KELLER,

   DEFENDANT-APPELLANT.

---

APPEAL from a judgment and an order of the circuit court for Waukesha County: LEE S. DREYFUS, JR. and LAURA F. LAU, Judges. *Affirmed*.

Before Neubauer, C.J., Reilly, P.J., and Gundrum, J.

¶1    GUNDRUM, J. Patrick A. Keller appeals from a judgment of conviction following a jury trial on three counts of causing mental harm to a child, his step-daughter A.M., as a party to the crimes. He also appeals from an order

denying his motion for postconviction relief.[1] Keller asserts that his constitutional Confrontation Clause rights were violated when the circuit court allowed the admission of statements made by confidential reporters to Child Protective Services (CPS) access workers because he had no ability to confront the reporters at trial regarding their statements.[2] We conclude that because the statements were not made for the primary purpose of gathering evidence for prosecuting Keller or substituting for testimony in a prosecution against him, they were not "testimonial" and thus, the Confrontation Clause was not implicated. We affirm.

## Background

¶2    Keller and his wife, Alicyn Keller,[3] were charged with and jointly tried, as a party to the crimes, on three counts each of causing mental harm to a child, between December 7, 2012, and March 4, 2015, in connection with their treatment of and conditions related to A.M. during this time period. A.M., who has significantly disabling autism, was between the ages of eleven and thirteen. Prior to trial, the State moved for a "preliminary finding" on the admissibility of evidence

---

[1] The Honorable Lee S. Dreyfus, Jr., entered the judgment of conviction. The Honorable Laura F. Lau entered the order on the postconviction motion. While Keller appeals from both the judgment and order, there is no need to address the order separately.

[2] Keller also briefly asserts on appeal that the reports the CPS access workers contemporaneously prepared based on the statements by the confidential reporters, and statements in those reports, were improperly admitted hearsay. Keller raises his hearsay arguments for the first time on appeal. Because of this and because these arguments are conclusory and insufficiently developed—for example, Keller fails to identify and analyze even a single particular statement of concern made by any reporter, but instead merely appears to claim that all "[s]tatements made by any reporter to CPS workers" are inadmissible hearsay—we do not address them. *See State Farm Mut. Auto. Ins. Co. v. Hunt*, 2014 WI App 115, ¶32, 358 Wis. 2d 379, 856 N.W.2d 633 ("Arguments raised for the first time on appeal are generally deemed forfeited." (citation omitted)); *see also Wisconsin Conf. Bd. of Trs. of United Methodist Church, Inc. v. Culver*, 2001 WI 55, ¶38, 243 Wis. 2d 394, 627 N.W.2d 469 (we do not address arguments that are conclusory and insufficiently developed).

[3] Alicyn is A.M.'s biological mother.

related to numerous CPS reports contemporaneously prepared in connection with contacts from confidential persons reporting disturbing conditions for and conduct toward A.M. Following a hearing, the circuit court granted the motion, paving the way for the admission of this evidence at trial.

¶3 Various Waukesha County Department of Health and Human Services (Department) employees, including CPS personnel, testified at trial regarding the statements in the CPS reports that Keller challenges generally on appeal. Keller has failed to identify any specific statements of concern related to these reports, yet, we cannot properly consider whether any statement is of a testimonial or nontestimonial nature—our critical inquiry—without examining the statements themselves. While we could conclude that Keller insufficiently develops his Confrontation Clause challenge based on his failure to identify statements of specific concern, we instead choose to examine the statements ourselves.

¶4 Kathy Mullooly, division manager of intake and shared services, which includes CPS, testified that the mission of CPS "is about protecting children, number [one], about helping families be self-sufficient, to be caring family units that are providing for the health and well-being of the children in their care." She explained that "the absolute primary reason that we have [CPS] at all" is to "keep[] kids safe."

¶5 Mullooly further testified that she supervises CPS "access workers" who take reports from persons contacting CPS regarding concerns about the well-being of a child ("confidential reporters"). The access workers ask the confidential reporters "many, many questions," such as "How old is the child? How vulnerable is the child? What are the capacities of the caregiver? Are … there drugs and alcohol involved?[,]" "in order to get that information." The access workers prepare

3

contemporaneous "Child Protective Services Reports" regarding these contacts. Mullooly explained that if "there are some conditions that we need to evaluate, we pass it on to one of our ongoing units, and they file a [Child in Need of Protective Services (CHIPS)] petition … that has ongoing involvement from social workers at the county." Seeking to remove a child from his or her home is the last resort:

> [W]e really want to … keep kids safe in with their families if at all, possible. We want to keep families intact.
>
> … If we remove a child, we want to place them with relatives, kinship placements ….
>
> … The last thing we want to do is remove a child, but we will if we have to [for safety reasons].

¶6 Specifically addressing several of the reports related to A.M., Mullooly agreed that they "all concern a child in need or at least allegedly." In discussing CHIPS petitions generally, Mullooly expressed that such petitions do not "automatically mean a law has been broken," rather they "mean[] … that there are safety concerns in that home."

¶7 Department access supervisor Sarah Vargas testified that when a confidential reporter contacts CPS regarding "concern for a child," the access worker prepares a report, which is then sent to an access supervisor to make a decision on whether investigation is warranted. She explained that the criteria for that decision are "not … criminal criteria." When asked if the purpose of this decision-making process is "to keep families together and kids safe" or "for litigation purposes going forward," Vargas responded that the purpose is "to ensure the safety of children."

¶8 Vargas testified to a January 30, 2013 report she prepared based upon a contact she received from a confidential reporter when she previously worked as

an access worker. Vargas explained that the reporter was "concerned for [A.M.] in her home," having witnessed Keller "yell[] and scream at [A.M.] nonstop [for] at least 20 minutes" and be "very degrading" and "verbally abusive" toward A.M., "screaming that they don't want her, she is no good, she is worthless." Keller was "screaming" about A.M. "having urination and bowel movement accidents" "on purpose," which accidents the reporter indicated "only happen[] when [A.M. is] at home." The reporter further told Vargas that A.M.'s "accidents" were shown "through testing" to "not [be] due to … a medical issue." The reporter conveyed that two younger children were also present during the screaming, and the reporter referenced also witnessing Keller "scream at them and harshly put them into a chair if they were standing up and moving around." The reporter expressed that Keller "was seen as very threatening and ugly in how he talked to all the children."

¶9 Vargas next testified to a February 12, 2013 report she prepared, explaining that the confidential reporter who contacted CPS that day informed her that A.M. "came to school with a soiled diaper" and the "contents of the diaper were all over" and added that "[t]here have been other occasions … where she comes to school with soiled diapers" and "the contents ... often appear[] dried, as if the diaper has not been changed for a long … time." The reporter also conveyed that "[a]t school [A.M. is] potty trained" but at home her "caregivers place her in diapers." According to this reporter, bruising was observed on A.M.'s right arm and shoulder, which looked as if "someone grabbed [her] forcibly," but A.M. gave "[two] different stories" related to the bruising, one that "she fell on the ice" and the other that "her mother hit her." The reporter indicated that A.M. was "difficult to get information from" and was "not a good communicator."

¶10 Another access supervisor, Bobbi Borchardt, testified regarding the December 7, 2012 and September 4, 2014 reports she prepared when she was an

access worker. Regarding the 2012 report, she stated that the confidential reporter told her that A.M. was "wearing the same clothes [two] days in a row," had been wearing a diaper and clothes that had been "soiled with dried feces and urine," and stated, "Mommy knew I pooped but she was crying and she just put my clothes on." The reporter added that A.M. "wears diapers at home and then to and from school ... despite … wearing underwear in other areas like at the grandparents' home without having any toileting issues"; wearing diapers was "at the insistence of the mother"; and "some mornings [A.M.] reports not eating breakfast at home." The reporter further indicated that A.M.'s younger stepsisters "had been given toys and other items" and Keller, their biological father, "interacted with them frequently" but that A.M. "was not provided with any of these items and [had] no interaction" with Keller. The reporter also conveyed that because of A.M.'s autism, A.M. was "not able to provide … a reliable narrative."

¶11 The confidential reporter who provided the information for the 2014 report indicated to Borchardt that A.M. "had stated that her mom hurts her," giving an example of her mother hitting her "when she goes upstairs when she isn't supposed to." The reporter, however, had observed no injuries to A.M. that suggested abuse. The reporter added that A.M. "eats dinner in her room"; "does not play games or watch movies"; "has to ask permission to get food when she's hungry or [to] use the bathroom," adding that A.M. "needs assistance toileting"; and "appear[s] to have a distended stomach which [is] either … due to constipation or … that she doesn't always eat dinner."

¶12 Access worker Kathryn Flansburg testified to reports she prepared based on confidential reporter contacts on August 1, 2013, and December 5, 2014. The 2013 reporter indicated that A.M. "doesn't always get her medication the way she is supposed to [a]nd sometimes her mother doesn't give her anything"; A.M.

"has poop all the way up her back and the poop appears crusty and hard which look[s] like it ha[s] been there a while"; A.M.'s mother "doesn't always change" A.M.'s PullUps because "she doesn't have time to deal with [A.M.] because she's busy dealing with her husband and her other [two] children"; "sometimes [the mother] seems … distracted and doesn't watch any of the children" and "lets them wander around in potentially dangerous areas while she's on the phone"; A.M. is "always hungry and … her mother does not have time to feed her"; when A.M. "does not pay attention, her stepfather, Patrick Keller, will hit her," however, no injuries were observed; Keller "does not like his [two younger biological] children to have contact [with] or touch [A.M.] [so they] make the children ride in different areas of the car"; and they "take the two [younger] children out to do fun activities and leave [A.M.] in day care ....  And then when they pick up [A.M.], they tell her about what they did with the other children while she wasn't with them."

¶13     Regarding the 2014 report, Flansburg testified that this confidential reporter indicated that the reason for the contact was concern that A.M.'s mother was "severely neglect[ing]" A.M., "not dealing with [A.M.'s] hygiene needs," and "not providing [A.M.] adequate care," specifically referencing an incident in which A.M. "had a dirty, wet diaper on," feces on her clothing, and "feces all over her [that] appeared to be hardened, as if it had been there for a while."  The reporter stated that A.M. "appeared very uncomfortable, even after the feces had been cleaned off and she was given clean clothing to wear."  The reporter "felt that the issue had been addressed with the mother … previously, … but [the mother] was not addressing [it] appropriately"; noted "that the [two] younger siblings in the home, never seemed to have any hygiene issues"; and believed the mother "was treating [A.M.] differently" and that "this was [not] appropriate."  The reporter indicated that A.M. "was diagnosed with autism and cognitive disabilities" and "has

7

hygiene issues [two or three] times a week." He/she added that A.M.'s "[m]other ... claims that [A.M.] is not potty trained, however, when [A.M.] is at school, they structure her potty breaks. She does not have any accidents and appears potty trained."

¶14 Flansburg also testified that this reporter indicated that the two younger girls "have physically attacked [A.M.] without the parents intervening," and A.M. "is excluded from family activities in the evening since she's in the basement." The reporter stated her belief that A.M.'s biological father has A.M. on the weekends and that A.M. "always seems clean after spending time with her father, and only seems to have hygiene issues on the days she's at her mother's home."

¶15 On cross-examination, Flansburg testified that the 2013 reporter indicated that A.M.'s mother was planning to attend parenting classes to which she had been referred. This reporter also told Flansburg that A.M. had been "wearing the same clothes for up to [three] days in a row" and that the reporter believed the mother "is overwhelmed with caring for" A.M. Flansburg testified that the reporter indicated that he/she was "told" the mother "doesn't have time to deal with [A.M.]"; A.M. is "always hungry, and mom doesn't have time to feed her"; "Keller will hit [A.M.] when she's not paying attention"; and Keller "does not like his kids to have any contact [with] or touch" A.M. Flansburg acknowledged that because the reporter only indicated he/she had been "told" that these things occurred, he/she did not actually "know" whether these allegations were truthful.

¶16 Much additional evidence was also presented at trial. Keller and his wife were both found guilty as charged. Keller now appeals the circuit court's ruling

regarding the admissibility of the confidential reporters' statements to the CPS access workers.

### *Discussion*

¶17 Keller argues that the evidence from the reports was erroneously admitted as it violated his Confrontation Clause right to confront the confidential reporters. He is incorrect.

¶18 Whether a Confrontation Clause violation has occurred is a question of law we review de novo. *State v. Mattox*, 2017 WI 9, ¶19, 373 Wis. 2d 122, 890 N.W.2d 256.

¶19 "[A] defendant's right to confrontation is violated if the trial court receives into evidence out-of-court statements by someone who does not testify at the trial *if* those statements are '*testimonial*' and the defendant has not had 'a prior opportunity' to cross-examine the out-of-court declarant." *Id.*, ¶24 (emphasis added; citation omitted). In *Mattox*, our supreme court noted that in *Crawford v. Washington*, 541 U.S. 36 (2004), the United States Supreme Court "did not provide a comprehensive definition of 'testimonial,' but it concluded that, 'at a minimum,' 'testimonial' statements include 'prior testimony at a preliminary hearing, before a grand jury, or at a former trial and ... police interrogations' because these are the types of evidence 'at which the Confrontation Clause was directed.'" *Mattox*, 373 Wis. 2d 122, ¶24. "Post-*Crawford*," the *Mattox* court stated, "confrontation challenges begin with an analysis of whether the out-of-court statements used against a defendant are 'testimonial.'" *Mattox*, 373 Wis. 2d 122, ¶24. "If the statements are not testimonial, the Confrontation Clause is not implicated." *Id.*

¶20 "In determining whether an out-of-court statement is testimonial, we must decide 'whether, in light of all the circumstances, viewed objectively,' the 'declarant is acting as a witness against the defendant ….'" *State v. Nelson*, 2021 WI App 2, ¶29, 395 Wis. 2d 585, 954 N.W.2d 11 (citation omitted). We make such a decision "by considering whether the 'primary purpose' of the statement was to 'gather evidence for [the defendant's] prosecution' or 'substitute for testimony in a criminal prosecution.'" *Id.* (citation omitted). Factors relevant to our analysis include: "(1) the formality/informality of the situation producing the out-of-court statement; (2) whether the statement is given to law enforcement or a non-law enforcement individual; (3) the age of the declarant and (4) the context in which the statement was given." *Mattox*, 373 Wis. 2d 122, ¶32 (footnote omitted). Considering the confidential reporters' statements in the case now before us in light of these factors, we have no problem concluding that the statements are nontestimonial and thus, the Confrontation Clause is not implicated.

¶21 With regard to the first factor, our supreme court expressed in *Mattox* that the "typewritten, titled, and signed" nature of the toxicology report in that case amounted to only "slight formality" and "d[id] not imply a testimonial purpose in a way that traditionally formal attestations, such as notarization or certification, might." *Mattox*, 373 Wis. 2d 122, ¶34. In *Nelson*, we concluded that the "same [could] be said" of the typed and titled medical report related to an examination performed on a sexual assault victim eleven days after the assault. *Nelson*, 395 Wis. 2d 585, ¶31. In both cases, the challenged statements were the observations and conclusions of medical professionals recorded in the professionals' own official, written report, *Mattox*, 373 Wis. 2d 122, ¶¶8-9; *Nelson*, 395 Wis. 2d 585, ¶¶14-19, yet the statements were nonetheless determined to be nontestimonial, *Mattox*, 373 Wis. 2d 122, ¶37; *Nelson*, 395 Wis. 2d 585, ¶45.

¶22 Here, Keller's Confrontation Clause challenge is centered on the oral statements the confidential reporters made to the access workers, which statements the access workers then included in their respective reports. There is no indication the statements were made by medical professionals or were otherwise professional opinions based upon particular expertise, and the reporters themselves prepared no official reports. Because the reporters did intentionally contact and make their oral statements to CPS workers, assumedly hoping for some type of action by these government employees, these statements could be considered to be more formal than, for example, a comment one neighbor might make to another at a backyard barbecue. However, these unsigned, untyped, untitled oral statements do not even reach the level of "slight formality" of the reports in *Mattox* or *Nelson*, much less "imply a testimonial purpose in a way that traditionally formal attestations, such as notarization or certification, might." *Mattox*, 373 Wis. 2d 122, ¶34; *Nelson*, 395 Wis. 2d 585, ¶33.

¶23 Related to the second factor, the confidential reporters made their statements to a CPS access worker, not law enforcement. *See Ohio v. Clark*, 576 U.S. 237, 246 (2015) ("[S]tatements to individuals who are not law enforcement officers ... are much less likely to be testimonial than statements to law enforcement officers."). We reasonably assume that all of the reporters would have been aware that they could have directly and immediately contacted law enforcement by simply dialing 9-1-1 or a nonemergency number as readily as they contacted CPS and that contacting law enforcement would have been the most direct, obvious and certain way to try to advance criminal action against Keller. But, the reporters did not contact law enforcement; they instead contacted an agency whose mission is, as CPS supervisor Mullooly testified, "about protecting children, number [one], about

11

helping families be self-sufficient, to be caring family units that are providing for the health and well-being of the children in their care."

¶24 As to the third factor—"the age of the declarant"—from the trial record we know that at least two of the reporters were adults who worked for Lutheran Social Services at the time they contacted CPS. Since the other reporters were confidential reporters, we do not know their identities or age. For purposes of this decision, however, we will assume (because such an assumption is more favorable to Keller) that the other reporters were also adults. Because the reporters were adults, this factor gives more weight toward the conclusion that the statements were testimonial than if the statements had been made by young children. *See Clark*, 576 U.S. at 247-48 (concluding that because "[f]ew preschool students understand the details of our criminal justice system," "[s]tatements by very young children will rarely, if ever, implicate the Confrontation Clause").

¶25 As for "the context in which the statement[s] w[ere] given," the fourth factor, each confidential reporter clearly contacted CPS because of his/her concern for the well-being of A.M. and in an attempt to secure A.M. some sort of CPS intervention, oversight, or assistance so as to improve the treatment of and conditions for her. *See id.* at 247 (in concluding that a child's answer to a teacher, which answer identified the defendant as the child's abuser, was not testimonial, the Court found it significant that it was "clear" that the "first objective" of the teacher's questioning was "to protect" the child). Keller has not identified, and we cannot find, any indication in any report that a reporter even hinted that Keller should be arrested or the police should be called based upon the concerns the reporter conveyed. *See id.* (observing that the child "never hinted that he intended his statements to be used by the police or prosecutors"). Moreover, the nature of the statements does not suggest that any reporter intended, desired, or even

12

contemplated that his/her statements to CPS might later be used in a criminal prosecution against Keller. *See Mattox*, 373 Wis. 2d 122, ¶¶32-33 (citing *Clark*, 576 U.S. at 245-49). And even if a particular reporter had contemplated that his/her statements to CPS might lead to criminal action against Keller, this was clearly not the primary purpose of any of the statements. *See Clark*, 576 U.S. at 247 ("The teachers' questions were meant to identify the abuser in order to protect the victim from future attacks. Whether the teachers thought that this would be done by apprehending the abuser or by some other means is irrelevant.").

¶26 Considering all of these factors, the balance weighs most heavily in favor of the conclusion that the statements by the confidential reporters to CPS were nontestimonial as their primary purpose was to improve the treatment of and conditions for A.M., not to "gather evidence for" or "substitute for testimony in" a prosecution of Keller. *See Nelson*, 395 Wis. 2d 585, ¶29 (citation omitted).

As a result, the Confrontation Clause was not implicated, much less violated, by the presentation of this evidence at trial.[4]

*By the Court.*—Judgment and order affirmed.

---

[4] Vargas testified at trial regarding another access report she prepared on June 12, 2014, and another access worker, Kris Borkowski, testified regarding access reports she prepared on June 20 and September 16, 2014. We need not detail the particular statements these confidential reporters—the two Lutheran Social Services employees—made to Vargas and Borkowski in relation to these reports, however, because the reporters themselves testified at trial and acknowledged that they were the reporters collectively responsible for making the statements. As our supreme court has clarified, a Confrontation Clause violation can only occur with regard to statements by a person who does not testify at trial. *See State v. Mattox*, 2017 WI 9, ¶24, 373 Wis. 2d 122, 890 N.W.2d 256 ("[A] defendant's right to confrontation is violated if the trial court receives into evidence out-of-court statements by someone *who does not testify at the trial* if those statements are 'testimonial' and the defendant has not had 'a prior opportunity' to cross-examine the out-of-court declarant." (emphasis added; citation omitted)); *see also Crawford v. Washington*, 541 U.S. 36, 59 n.9 (2004). Thus, because these reporters testified, there is no Confrontation Clause violation for this reason alone. We note, however, that the statements by these reporters were in the same vein as those made by the confidential reporters connected to the other access reports. Thus, even if these reporters had not testified at trial, there still would be no Confrontation Clause violation because the primary purpose of their statements was to improve the treatment of and conditions for A.M., not to "gather evidence for" or "substitute for testimony in" Keller's prosecution. *See Nelson*, 395 Wis. 2d 585, ¶29 (citation omitted).