# COURT OF APPEALS OF WISCONSIN
## PUBLISHED OPINION

Case No.:      2021AP1590-CR

†Petition for Review filed

Complete Title of Case:

**STATE OF WISCONSIN,**

      **PLAINTIFF-APPELLANT,**

  **V.**

**ANTONIO G. RAMIREZ, JR.,**

      **DEFENDANT-RESPONDENT.†**

| | |
|---|---|
| Opinion Filed: | November 15, 2023 |
| Submitted on Briefs: | October 27, 2022 |
| Oral Argument: | |

| | |
|---|---|
| JUDGES: | Gundrum, P.J., Neubauer and Grogan, JJ. |
| Concurred: | |
| Dissented: | |

Appellant
ATTORNEYS:     On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Joshua L. Kaul*, attorney general, and *Jacob J. Witter*, assistant attorney general.

Respondent
ATTORNEYS:     On behalf of the respondent, the cause was submitted on the brief of *Andrew R. Hinkel*, state public defender, Madison.

# COURT OF APPEALS
# DECISION
# DATED AND FILED

## November 15, 2023

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2021AP1590-CR**

Cir. Ct. No. **1999CF950**

STATE OF WISCONSIN

IN COURT OF APPEALS

---

STATE OF WISCONSIN,

    PLAINTIFF-APPELLANT,

V.

ANTONIO G. RAMIREZ, JR.,

    DEFENDANT-RESPONDENT.

---

APPEAL from an order of the circuit court for Kenosha County: DAVID P. WILK, Judge. *Reversed and cause remanded with directions*.

Before Gundrum, P.J., Neubauer and Grogan, JJ.

¶1 GUNDRUM, P.J. In ***Ramirez v. Tegels***, 963 F.3d 604, 618-19 (7th Cir. 2020), the United States Court of Appeals for the Seventh Circuit affirmed the district court's grant of Antonio G. Ramirez, Jr.'s petition for a writ of habeas corpus and ordered the State to "either release Mr. Ramirez from custody or grant him a

new appeal in which he may advance his confrontation [clause] claim" related to his convictions from a 2001 jury trial for sexually assaulting his step-daughter, Megan,[1] in November 1998 and September 1999. His appeal rights reinstated, Ramirez filed a postconviction motion in the circuit court contending he was entitled to a new trial because (1) his Confrontation Clause rights were violated by the admission at trial, through other witnesses, of out-of-court statements by Megan and her younger brother, neither of whom testified at trial, and (2) he was denied his right to a fair trial because he was barred from impeaching a State witness, Dr. Michael Schellpfeffer, in connection with immunity the State granted him for his testimony. The circuit court agreed with both of Ramirez's contentions, granted his motion, and ordered a new trial. The State appeals, and we now reverse and direct the circuit court to reinstate Ramirez's October 29, 2013 amended judgment of conviction.

## *Background*

¶2 On September 7, 1999, Ramirez was charged with two counts of sexually assaulting seven-year-old Megan on November 8, 1998, as well as with child enticement and sexually assaulting her on September 5, 1999.[2] The following evidence relevant to this appeal was presented at his 2001 trial.

¶3 Officer George Larsen testified that on September 5, 1999, he was dispatched to Megan's grandmother's residence, where he spoke with Megan's mother. In a "very emotional, sad, crying, concerned" state, she indicated she

---

[1] Megan is a pseudonym.

[2] Ramirez was also charged with child abuse (related to alleged abuse of Megan's younger brother), battery (of Megan's mother), false imprisonment, and resisting an officer, all related to September 5, 1999 allegations, but he was found not guilty of those counts.

believed Megan had been sexually assaulted by Ramirez because when she returned to her residence that evening, "the door was locked with a chain which was not normal" and she had to force it open; "[u]pon entering … she saw [Ramirez] coming out of the child's bedroom pulling up his shorts" and Megan "sitting on the toilet, and she had a look on her face"; and her son told her that Ramirez "had [Megan] on the bed face down, and there were boogers on the bed." The mother also told Larsen that after returning to her residence and observing what she had observed, she angrily confronted Ramirez, and a fight ensued. Ramirez initially prevented her from leaving the residence, but eventually Megan's grandmother picked her and the children up and drove them to the grandmother's residence.

¶4     Larsen transported Megan and her mother to the hospital and was in the emergency room (ER) for some time while Nurse Donna Halpin spoke with Megan. Larsen gave Megan a Teddy bear, which she held while she talked with him. Megan told him "that her father[3] had put her face down … on the bed, and … put his private by her pooh-pooh," and she showed Larsen on the bear where Ramirez had touched her "with his private." She also told Larsen that when she went to the bathroom and wiped herself, "there was brown stuff on there." Larsen told his supervisor, as well as evidence technician John Gray, to look for evidence of such wiping.

¶5     Asked if he "hear[d] any conversation between either [himself] and [the nurse] and [Megan] about any incident that occurred in November of 1998," Larsen responded, "Yes. [Megan] also stated that when this happened before that it was her dad." As Megan's mother was then explaining to Larsen that months

---

[3] Megan's mother testified that Megan has always referred to Ramirez as "her father, daddy," even though he is actually her step-father.

earlier she had taken Megan to St. Catherine's Hospital because of vaginal bleeding that the mother believed was from a bathtub fall, Megan interjected, "No, my daddy did it."

¶6      On cross-examination, Larsen acknowledged that at no point was he alone with Megan or her younger brother, and he could not recall if it was Megan or her mother who first mentioned the November 1998 assault. He again testified that the mother had stated that the younger brother "had told her that [Megan] was face down on the bed with dad and there were boogers on the bed[]." Larsen acknowledged he believed "boogers" could be "some evidence of semen or sperm" and that he had informed evidence technicians as to where to look for evidence in the home. He agreed that he had told the mother while at the grandmother's residence that they would be going to the hospital and "ha[d] to do a rape kit."

¶7      Halpin testified that she had twenty-six years of combined experience as a pediatric nurse taking care of children "for any type of medical or emotional problems" and as an ER nurse "do[ing] lots of things," including "assess[ing] patients as they come in to find out the acuity of care that's needed." She agreed it was "part of [her] responsibility to obtain the history from a patient," adding that a nurse

> need[s] a history to find out current events that are going on with the patient[,] their history in the past, past medical problems. We try to find out exactly the symptoms they've been having and what they've been treated for before, and what's been surrounding the current reason that they're in the emergency department.

After obtaining the history, a nurse "document[s] it on the chart and … share[s] that with the physician and then we take care of the patient together."

¶8      Halpin further testified that Megan arrived in the ER on September 5, 1999, accompanied by her mother and Larsen. The mother told Halpin she had been gone from the house for a short time, and when she came back, the door was locked, "which was unusual." The mother

> said she broke in to get through the door. And when she got in the house she saw her husband coming out of [Megan's] bedroom pulling his pants up…. [N]ext she saw [Megan] on the toilet in the bathroom and she went in there. She said that [Megan] had a very bad look on her face, and she knew something bad had happened.

¶9      Because Megan was "very frightened," Halpin began with a general, noninvasive examination and asked basic questions to build rapport. Halpin was eventually able to ask Megan more substantive questions, and with Halpin and Megan's mother both talking with Megan, she slowly revealed details. Halpin asked Megan "where this happened," and she responded, "in her bedroom." Megan further told Halpin "[t]hat her dad had taken off her pants and he took off his pants, and she was laying on her belly on the bed. And he put his pee-pee by her butt. Well, like on top of her." Megan's mother was crying, upset, hugging Megan, and "[t]elling her to tell us the truth." Megan further told Halpin she "felt something by her butt, so she went into the bathroom and she wiped herself with some tissue and threw it in the wastepaper basket."

¶10     Halpin asked Megan "if this was the first time something like this had happened," and Megan responded, "No." Megan's mother then asked her "if when she went to St. Catherine's for her vaginal bleeding did she really hurt herself on the bathtub. And she said: No, she hadn't," adding "that dad … was trying to put his pee-pee inside of her and that's how she got cut. That it wasn't the bathtub." Halpin asked Megan why she had not told anyone, and Megan informed her that

Ramirez "had told her that if she told anybody about this that he would hurt her little brother, her mom or her grandma."

¶11    Halpin also testified that Dr. Suzanne Siegel entered the room and examined Megan with Halpin's assistance. Halpin observed "a creamy discharge" in Megan's vaginal area, which she indicated "could be a normal finding in an adult [but not] on a young girl." Siegel utilized a "Woods lamp," which shows purple if "semen" is present, and it revealed "little speckles of purple all over [Megan's] thighs." Samples of the substance were obtained, with one being sent, Halpin believed, to "the lab" and one to "the crime lab." Halpin recovered clothing from Megan "[a]ccording to a rape protocol that we follow," and after Megan had been discharged from the ER, Halpin provided a police officer with a written statement as to what had occurred.

¶12    On cross-examination, Halpin acknowledged that according to a September 5, 1999 report by Siegel, there was no indication vaginal penetration had occurred. On redirect examination, she testified that the "diagnostic impression" from the report stated "[p]hysical findings are consistent with sexual assault" and confirmed that the report indicated "[r]edness" was observed on Megan's vaginal area. On further re-cross-examination, Halpin acknowledged that such redness "could also come from a child rubbing herself," but based upon the particular redness Megan had, Halpin denied that it "could also come from … [l]ike a mother wiping a child." She indicated she did not know whether it could come "from someone putting something in the child."

¶13    Siegel testified that she was the ER physician who examined Megan on September 5, 1999. Megan's mother informed Siegel that Ramirez appeared intoxicated when she left their residence, and when she returned, "the door was

locked and she had to break into the door. And she found the child in the bathroom wiping herself and … her husband leaving the child's room pulling his pants up."

¶14 Siegel asked Megan "very specific questions," and Megan told her that Ramirez "to use [Megan's] words … had put his pee-pee by her. And she pointed to her buttock area." Siegel examined Megan, beginning with a general examination and then proceeding to a vaginal examination, which revealed "a milky discharge coming from the vaginal area." Siegel agreed this would not be a normal finding with a small child. When Siegel used a Woods lamp on Megan's legs, "[they] lit up and that suggests seminal fluids." Siegel stated that her findings were "consistent with sexual misuse." She obtained samples and swabs from Megan's vaginal area and agreed that some were "sent … to our hospital laboratory" and some were "sent … as evidence."

¶15 Discussing her review of Dr. Schellpfeffer's records related to Megan's November 1998 hospital visit, Siegel noted that Megan had been operated on for repair of a laceration similar to an episiotomy.[4] Asked if that type of injury was consistent "with any other sort of an injury beside a sexual misuse," Siegel responded, "Childbirth," but she agreed childbirth would not have been the cause of this injury "with a[n] 8-year[-]old child."

¶16 On cross-examination, Siegel agreed that Megan had indicated to her on September 5, 1999, that Ramirez had touched her buttock area, not her vaginal area. Explaining how it then was that discharge was found in her vaginal area, Siegel stated, "It's very common for men to masturbate and ejaculate in that vicinity,

---

[4] At trial the day prior, Dr. Judy Guinn had described an "episiotomy" as "a cut that a surgeon or an obstetrician would make down through the posterior forshet (phonetic) here to allow a baby to emerge from the vaginal canal."

and the fluids can travel from the entire area." She stated she had "separated the labia and [Megan] had a large amount of fluid and [she] took a swab of that [outer vaginal] area." Siegel acknowledged it would be possible for someone to place seminal fluid on another person and that a child could get redness on her vaginal area if someone were to "rub" her there. When asked if Megan's November 1998 injury could have been caused by her falling "on a hard object," Siegel indicated she "would expect other injuries noted if she had fallen on something."

¶17   On redirect examination, Siegel agreed that as an ER doctor, she had seen both "penetration type injuries which resulted from sexual misuse" as well as straddle injuries. When asked if there was anything in Schellpfeffer's description of Megan's November 1998 injury "that would make th[at] injury inconsistent with a straddle type or accidental type injury," Siegel responded that Schellpfeffer's report indicates Megan had "a laceration extending up one-half the length of [her] vagina in the midline," but there was "no documentation of other trauma," such as bruising or swelling, which she "would expect … if it was a straddle injury." A straddle injury, she indicated, would cause "extreme injuries" to external genitalia, but the records showed that Megan's external genitalia, as well as her urethral orifice,[5] "appear[ed] normal." When asked if Megan's November 1998 injury "was consistent or inconsistent or diagnostic for sexual misuse," Siegel responded, "it's pretty much diagnostic." She further testified she had "[n]ever seen an injury of the sort that was described by Dr. Schellpfeffer that was caused by anything other than sexual misuse."

¶18   Megan's grandmother testified that on September 5, 1999, she picked up Megan's mother, Megan, and Megan's younger brother from their residence and

---

[5] Siegel testified that the urethral orifice "is where you would urinate from."

brought them to the grandmother's residence. The mother was "angry" and "upset." Megan's mother told the grandmother that when she came home to her residence that evening, "the door was closed, so she pushed it open." When the prosecutor asked the grandmother if she remembered Megan's mother telling her "anything about a chain on the door," the grandmother responded, "If she did then that's what it was. It was a chain on the door and she pushed it open." Referring to a report by Detective John Gregory, which was in front of the grandmother during her testimony, the prosecutor asked: "Do you remember [telling] Detective Gregory: [']On the way to my house my daughter told me that when she got home she saw [Ramirez] pulling up his shorts and the door was locked and she said the chain was on the door.['] …?" The grandmother responded, "I hear you reading it to me, and I read it. Like I said, again I don't remember. If I said it that night, it's here on paper." The grandmother acknowledged telling Gregory that Megan's mother had told her that she "had to kick the door open."

¶19     At her residence, the grandmother asked Megan what happened, and Megan told her "that her daddy touched her bottom." Also while there, Megan's mother called the police, and the responding officers eventually took Megan and her mother to the hospital. On cross-examination, the grandmother agreed Megan "would do what her mother wanted her to do."

¶20     Gregory testified that he spoke with Megan's mother at the hospital on September 5, 1999. She informed him that when she returned to her residence earlier that night, the door was locked, and when she unlocked and began to open it, the chain was on the door, and she observed Ramirez "standing in front of the doorway of her bedroom pulling up his shorts." She "forced" her way in, breaking the chain, "confronted [Ramirez] about what was going on," and "I believe she went into the bathroom and [Megan] was in the bathroom wiping herself off." While

9

"very upset, crying," Megan's mother also told Gregory that Megan had informed her that when Megan had been taken to the hospital for vaginal bleeding in 1998, it was because Ramirez had "had sexual contact with her which caused the injury to her vagina."

¶21 On September 6, 1999, Gregory interviewed Megan, her mother, and her brother at the police department. He testified that the mother "took her time reading each page" of her statement before signing it. Megan's brother, interviewed alone, told Gregory that he "s[aw] his dad take his shorts off" in the bedroom with Megan and had seen "boogers" on the bed. Megan, with her mother present, told Gregory that after her mother left the residence, Ramirez separated her and her brother into different bedrooms, removed his shorts, had her face down with her clothes off, laid on top of her, and "rubbed his private parts against her butt."

¶22 On cross-examination, Gregory agreed he did not have an opportunity to speak with Megan alone because "she wanted her mom in the room with her"; the mother had told him that while she and Megan were at the grandmother's house on September 5, Megan told the mother that her November 1998 injury had been caused by Ramirez; when he asked Megan about her surgery, she responded, "Dad did it"; and the mother had informed him that Megan told her that Ramirez had threatened to harm Megan's grandmother.

¶23 Megan's mother also testified. At the time of trial, she had been married to Ramirez for two years but had been in a relationship with him for nine. They have one child in common, Megan's younger brother, who was five years old on September 5, 1999. Megan is the mother's daughter by another man.

¶24 The mother testified that relatives were at her and Ramirez's residence on September 5, 1999, and Ramirez was consuming alcohol. At some point in the

evening, the mother drove Ramirez's uncle home, leaving Ramirez "passed out on the[ir] bed" with Megan and her brother as the only other persons at the residence. She did not lock the door to the residence when she left, but when she returned, the door was locked.

¶25     The mother testified that she unlocked the door and entered and that there was no chain on it. When asked by the prosecutor, "Do you recall giving a statement to a variety of people that once you unlocked the door you had to push the door open?" the mother responded, "Possibly [I] could have said that." When then asked, "And you had to break the chain to enter the residence?" She stated, "I didn't break the chain, because the chain wasn't on the door." The following exchange then took place:

> [Prosecutor:]          Would it be fair to say that you did not want to testify in this case, you didn't want to be here today?
>
> [Megan's mother:]     No.
>
> [Prosecutor:]          You do want to be here today? You don't have any objection—
>
> [Megan's mother:]     I don't have a choice but to be here.
>
> [Prosecutor:]          I understand. That's the reason you are here, because you have no choice, right?
>
> [Megan's mother:]     But I have a right to plead the Fifth Amendment also.
>
> [Prosecutor:]          Well, are you pleading the Fifth Amendment?
>
> [Megan's mother:]     I would rather, yes.
>
> [Prosecutor:]          Well, your Honor, I request the witness be instructed to respond to the question posed to her.

¶26     Outside the presence of the jury, Megan's mother was eventually granted immunity in relation to her testimony. The jury returned, and testimony

continued with the mother again stating the chain was not on the door, and she did not break it. When asked if she recalled telling her mother, Megan's grandmother, that she had to break the chain in order to enter the residence, Megan's mother stated she did not recall saying that. When asked how the chain "g[o]t pulled off the door jam[b]," she stated she did not know.

¶27 Megan's mother denied that on September 5, 1999, she told Officer Larsen, ER nurse Halpin, and Dr. Siegel that when she returned home from dropping off Ramirez's uncle, the chain was on the door so she had to force it open. When asked if she remembered telling Detective Gregory on September 6, 1999, "I unlocked the door but the chain was on the door," she responded, "I don't remember saying that." When asked if she denied telling Gregory, "I pushed on the door hard and the chain busted," she stated, "I deny saying that because the chain wasn't on the door." She again stated she did not know how the chain lock had gotten "busted off the door."

¶28 When the prosecutor asked her what she had observed when she opened the door to the residence, she responded, "I didn't see anything. My daughter was in the bathroom." When then asked where Ramirez was, she said, "Laying down." When asked if she remembered "telling your mother that you saw the defendant pulling up his shorts outside [Megan's] bedroom," she responded, "I don't remember saying that." When asked if she remembered telling Larsen that she saw Ramirez "coming out of [Megan's] bedroom pulling up his shorts," she stated, "Yes," adding that she told Larsen this because she was angry. She further testified she did not recall telling Halpin, Siegel, or Gregory that she saw Ramirez coming out of Megan's bedroom pulling up his shorts. However, when asked if it was true that "at the time that you made this allegation about a sexual assault it was based … partly upon what you saw when you entered that residence," she

12

responded, "No, I guess of *what I thought might have happened*, not of what I seen happen because I was not there." (Emphasis added.) She then stated that Ramirez "was in the room … passed out."

¶29 Megan's mother stated she was angry because her family was at their residence and Ramirez had been drinking. She subsequently testified she was angry because one of Ramirez's former girlfriends, "Tracy," had called the residence that day asking for Ramirez and indicating to the mother that she and Ramirez "were supposed to meet somewhere," and the mother thought that when Ramirez had left the residence earlier in the day, it may have been to meet Tracy. The mother testified: "I told [the] kids that they were not going to see their dad anymore" and "that I was going to put [him] in jail because this had to stop. He wasn't going to make me a fool." Around this same time, she called her mother, Megan's grandmother, to come get them, and then she and the children went to the grandmother's house.

¶30 The mother testified that because she was angry, she told her mother "that I had thought [Ramirez] had d[id] something" to Megan. She stated that at the grandmother's house, she spoke with Megan alone and told her "that I had called the police on her dad and that they were probably going to make her go to the hospital"; Megan said she did not want to go. When the prosecutor asked Megan's mother, "Why did you tell your daughter that she would probably have to go to the hospital," she responded, "Because of what I was going to say that [Ramirez]—that I thought [Ramirez] had done something to her." The mother testified that Megan had never told her that Ramirez "had touched her in a bad way." When asked, "[Megan] had never told you while she was at your mother's residence that when she had gone to the hospital before he had done that to her; she hadn't fallen in the bathtub?" the mother responded that Megan "never said that."

13

¶31    Megan's mother testified that she called the police from the grandmother's residence, and when Larsen arrived, she told him "me and [Ramirez] had been fighting, he had pushed me and that he had done something—or I believed he had done something to my daughter." Larsen asked her if she understood what she was accusing Ramirez of and that he would have to take them to the hospital "to be checked out." He then drove Megan and her mother to the hospital.

¶32    At the hospital, Megan's mother told Halpin—she believed with Larsen present—that Ramirez "had assaulted my daughter." The mother asked Siegel if she and Megan could go home, and Siegel said, "[N]o, that they had to do this kit that they do when—cases like this," and Megan started crying. Siegel and Halpin then examined Megan.

¶33    When the prosecutor asked the mother if Megan ever said anything to her about the time she went to the hospital in November 1998, the mother responded, "She never said anything about '98." When asked if Megan ever told the ER nurse that "when she went to the hospital before that she didn't fall in the bathtub, that her daddy did that," the mother responded, "She didn't say that." The mother also denied Megan ever said that to her or Megan's grandmother. When asked if Megan ever said that to Siegel, the mother stated that Megan "didn't talk to the doctor."

¶34    The prosecutor next asked the mother "what happened the day [Megan] had surgery back in November of 1998." The mother stated she had just returned home from work and Megan was taking a bath; the children were home, along with Ramirez and his cousin, Ignacio Carreon. Megan yelled, and when the mother went into the bathroom, she observed blood "on the hump of the bathtub" and Megan standing in the tub bleeding from between her legs, stating she had fallen while trying to get out of the bathtub. The mother further testified that she took

14

Megan to the hospital and told the nurse Megan had "fallen down in the bathtub." When asked multiple times if Schellpfeffer, the obstetrician/gynecologist who performed the November 8, 1998 surgery on Megan, told her that Megan's injury "was consistent with sexual misuse" or asked her if someone could have sexually assaulted Megan, the mother repeatedly responded, "No, he did not."

¶35 The mother testified that she believed Ramirez had been drinking on November 8, 1998, and she acknowledged that it was after the "incident" on that day that he "stopped drinking," he had "not been drinking" since, but then he was "drinking again" on September 5, 1999.

¶36 The prosecutor asked the mother if she "remember[ed] telling Detective Gregory that [Megan] said: [']Mommy, remember when I had surgery? And I said: Yeah.['] Do you remember telling anything about that to Detective Gregory," the mother responded, "No, because we never talked about that." The prosecutor then presented the mother with the signed statement she provided Gregory on September 6, 1999. After she read the statement, the prosecutor asked her: "Now, this statement is inconsistent in virtually every single respect with the testimony that you gave here this morning regarding what happened on September 5th, 1999, isn't it?" The mother responded, "Yes." She acknowledged that in the statement, she stated: (1) "I pushed on the door [at their apartment] hard and the chain busted"; (2) "[w]hen I got in the apartment, I saw [Ramirez] standing in the doorway of my kids' bedroom. He was pulling up his Dallas Cowboy shorts"; (3) "[m]y son was in my bedroom because his father had told him to stay in there"; (4) with Megan's grandmother present, Megan "started crying and said that daddy had touched her like he is not supposed to"; (5) Megan told her: "Mommy, remember when I had surgery? I said: Yeah. And [Megan] said: I didn't fall down, daddy did that to me"; (6) "I said [to Megan]: Why didn't you ever tell mommy?

15

[Megan] was crying and said: Because daddy said he would hurt you and [her brother] and that he would hurt Nana (grandma)"; (7) at the hospital, "[a] lady nurse, … Donna, started talking to my daughter. I was there along with the police officer"; (8) "[m]y daughter had a Teddy bear and she didn't want to talk about it, but did show us using the bear"; (9) Megan "turned the bear over and said: Daddy touched her on the butt and pointed to the bear's butt"; (10) "[t]he nurse talked to her some more and my daughter said that daddy took her into her bedroom and told her brother to stay in our room"; (11) "She said: Daddy pulled her shorts and underwear down or off [and] had taken off his shorts and underwear. She said she was face down on her tummy on the bed and daddy laid on top of her"; (12) "[t]he nurse asked her how or where she was touched, and she said: Daddy's private touched her butt."; and (13) "[m]y daughter was examined and the nurse told me that semen was found on my daughter's leg. The nurse showed me a blue light that was used to find the semen." Upon further questioning by the prosecutor, the mother acknowledged she signed the statement saying these things, but she denied having told Gregory (5), (6), (9), and (11), admitted (7), and stated she did not recall (1), (3), (4), (8), (10), (12), and (13).[6]

¶37 Megan's mother denied that Megan ever communicated anything to Halpin, Siegel or Larsen indicating she had been sexually assaulted by Ramirez, adding that Megan "didn't talk." When asked if she recalled telling Larsen she had spoken with her son and he had told her there were "boogers" on the bed in his bedroom, she stated, "I didn't say that because I never talked to my son." In response to separate questions by the prosecutor, Megan's mother further denied telling Larsen that her son had told her "that [Megan] was face down on the bed and

---

[6] The prosecutor did not ask her further questions about (2).

16

that [Ramirez] was standing behind her with his pants down" and "that he had seen [Ramirez] with his pants down laying on top of [Megan] on the bed."

¶38     When the prosecutor referenced the trial having been previously scheduled for a time months earlier and then asked her, "You knew you were supposed to be in court; in fact you fled the jurisdiction, didn't you, in order to avoid going to court," she responded, "Yes, I did leave." She acknowledged that she spoke with a person named Sandor Mariyani[7] shortly after that earlier trial date had passed and told him she "hoped that if I and the kids disappeared for a couple of days this would all go away."

¶39     Megan's mother acknowledged she had written letters to the various judges who had presided over Ramirez's case since he was charged. The exchange regarding her first letter, dated September 16, 1999—just eleven days after the second assault—went as follows:

> [Prosecutor:]          [Do you see] where you wrote: [Ramirez] always has been an easy person to get along with, hardworking and most of all caring person and a good father. He would never hurt our children *had he been sober or in the right state of mind*.
>
>     Now, at that point you're not saying he didn't hurt your child. You're just saying he was intoxicated, correct?
>
> [Megan's mother:]     *Yes*.
>
> [Prosecutor:]          You go on to say … :  I know what he *has done* is serious *and you don't do things to anyone, especially a child*.  I feel he needs help, mental and other treatment for drug and alcohol.  It's obvious he's got a problem with drinking.

---

[7] Although the record is not entirely clear on this point, it appears to indicate Sandor Mariyani may have been an investigator for the State.

17

Now, that was in a statement that you were making to Judge Kluka on September 16, 1999, correct?

[Megan's mother:] *Yes*.

[Prosecutor:] … [Y]ou weren't telling [Judge Kluka] anything about a woman named Tracy, you weren't denying that these sexual assaults had occurred, you were just saying that your husband, if he had done these things, must have done so because he was intoxicated, correct?

[Megan's mother:] That's what I wrote in the letter.

….

[Prosecutor:] So on September 16th, 1999 when you wrote to Judge Kluka were you lying to her at that time as well?

[Megan's mother:] Yes, because I was afraid that possibly I would have charges on myself when I was trying to come out and say the truth by writing the letter.

(Emphasis added.)

¶40 Regarding an October 18, 1999 letter she wrote to the circuit court, the mother acknowledged that it stated: "When we were at the hospital my daughter was questioned about what had happened. She stated that something had happened on that date, September 5th, 1999." When the prosecutor then asked, "Now, in light of that do you still deny that your daughter had disclosed to Officer George Larsen, Nurse Halpin and Dr. Siegel that she had been sexually assaulted that day," the mother responded, "She never talked to them in the hospital. She never talked to anyone."

¶41 The mother acknowledged telling the circuit court in that letter: "I did also say that I saw my husband in the doorway of our children's room fixing his shorts or something to that effect. My daughter was in the bathroom." The prosecutor then asked her, "So in light of that do you still deny the fact that you told

people that you saw [Ramirez] standing in the doorway of his children's room fixing his shorts?" She responded, "I don't remember saying that," but she then acknowledged again that she wrote that in her letter.

¶42 The mother also acknowledged that she wrote in the October letter: "They also state that I broke the door in. That's a lie, because I said I pushed the door in and the chain broke." When the prosecutor asked her if, by sending the letter to the circuit court, she was trying to tell the court the truth regarding what happened on September 5, 1999, she responded, "I was trying to come out with the truth, yes." The prosecutor next asked, "And so the truth was that you did push the door in and you did break the chain on September 5th, 1999; isn't that true?" She responded, "The chain was never on the door," and she subsequently indicated she was lying to the court in the letter "[b]ecause I had already lied to the police." She acknowledged that her letter to the court also stated, "[t]hey, being the nurse and officer and myself in the room, [Megan] stated she had surgery, then she began crying and they kept asking questions. She then said her dad did something." The mother then indicated she was lying to the court in writing that as well.

¶43 Related to a December 19, 1999 letter the mother wrote to the circuit court, the mother acknowledged writing: "He would never hurt the children or myself in any way *if he was not drinking*." (Emphasis added.) The mother again acknowledged that Ramirez had been drinking on September 5, 1999. When then asked, "And it's your view in this letter to [the court] that that's why he hurt [Megan]," she responded, "He didn't hurt—he didn't do anything."

¶44 On cross-examination by Ramirez's counsel, the mother agreed she had at times been very angry with Ramirez because she had "found him with other women," and she indicated she had gotten a sexually transmitted disease she

19

believed had come from Ramirez, so after that she always required him to wear a condom when they had sex. She agreed she sometimes gets "out of control" when she is very angry with Ramirez, acknowledging she once "chase[d] him down the roads through Kenosha" and another time had "head-butt" him. She indicated she had "in the past threaten[ed] to get him in trouble if he didn't do what [she] wanted." She further agreed she had had family over on September 5, 1999, and was not happy Ramirez was drinking that day; at some point, Ramirez was "so drunk that he was unconscious"; she was "outraged because he had embarrassed" her; and Carreon had brought Ramirez into the residence and laid him down in her and Ramirez's bedroom.

¶45 When asked by Ramirez's counsel, "What happened in that apartment," the mother responded, "Nothing happened. I was upset with [Ramirez] because he had been drinking and he had embarrassed me …." When asked, "What did you think about and what did you do?" she responded, "I don't think I was thinking much. I just was angry at him and wanted to pay him back or get him in trouble some way for embarrassing me." She indicated she called her mother and left her residence "[b]ecause I was angry and because [Ramirez] was passed out and we were supposed to go do something that afternoon." She expressed that she wanted Ramirez "gone" and to "[p]ay him back," so she decided "[t]o call the police and lie and say that [Ramirez] did something to my daughter." The following exchange occurred:

> [Ramirez's counsel:] Did *you* do something to your daughter?
>
> [Megan's mother:]  No, I didn't do anything to her.
>
> [Ramirez's counsel:]  How long were you in that apartment … with the children there while Mr. Ramirez … was conked out on the bed?

20

> [Megan's mother:] Say about 2 hours, 3 hours.
>
> [Ramirez's counsel:] You did nothing to your daughter?

(Emphasis added.) The prosecutor objected with, "[a]sked and answered," and the court stated: "She said she did nothing to her daughter." The exchange continued:

> [Ramirez's counsel:] You've seen reports that indicate that that day sperm was found on your daughter's underpants, on a piece of toilet paper in the bathroom, on your child's thigh, and by her vagina. Did you have anything to do with that?
>
> [Megan's mother:] I *had told her to lay down with her dad in the room.*
>
> ....
>
> [Ramirez's counsel:] Why?
>
> [Megan's mother:] I don't know.
>
> [Ramirez's counsel:] How long did you have her lay down in there?
>
> [Megan's mother:] About ten minutes.
>
> [Ramirez's counsel:] Did you do anything to her?

(Emphasis added.) The prosecutor again objected, and the court stated, "I think you are going to have to be more specific other than that general question."

> [Ramirez's counsel:] You are now telling us that you told her to go lay down on a bed with her [step-]father?
>
> [Megan's mother:] Yes.
>
> [Ramirez's counsel:] *Isn't it true that you put his semen on her?*
>
> [Megan's mother:] *No.*

(Emphasis added.) Questioning continued:

> [Ramirez's counsel:] What was she wearing when she laid down on that bed, that you told her to lay down on that you never told anyone before?

21

[Megan's mother:]     She had shorts on that day.

Counsel asked how the chain lock "g[o]t broken that you said that day you had to push the door in, and then you said later you didn't push the door in?" and the mother responded, "I don't know."

¶46     The mother indicated she, Megan, and Megan's brother were watching television in the living room after she returned from taking Ramirez's uncle home.  Cross-examination continued:

[Ramirez's counsel:]  So she wasn't [o]n the toilet wiping herself with a piece of paper?

[Megan's mother:]     No.

[Ramirez's counsel:]  Why did you tell them that?

[Megan's mother:]     Because I lied.

[Ramirez's counsel:]  Why did you lie like that?

[Megan's mother:]     I was angry and I wasn't thinking.

[Ramirez's counsel:]  But not only did you tell the police things, how did your daughter come to tell the police things?

[Megan's mother:]     She really didn't talk, but I—

[Ramirez's counsel:]  She did talk.

[Megan's mother:]     I had told her to say what I wanted her to say.

[Ramirez's counsel:]  What did you tell her to say?

[Megan's mother:]     That her dad had d[one] something to her.

[Ramirez's counsel:]  Where were you when you told her to do this?

[Megan's mother:]     At home, before I called my mom.

[Ramirez's counsel:]  What words did you tell her?  What did you tell her?

22

[Megan's mother:] To say that her dad had touched her.

[Ramirez's counsel:] And what did your daughter say when you said to do this?

[Megan's mother:] She didn't want to. She was crying.

[Ramirez's counsel:] And how did she get those blue underpants that had sperm on them?

[Megan's mother:] I don't know.

[Ramirez's counsel:] You're telling us you told her to say those things, but *you're saying you didn't take a used condom and wipe the stuff on the kid*?

[Megan's mother:] *No*.

[Ramirez's counsel:] That would be a terrible thing to admit, wouldn't it?

[Megan's mother:] Guess so.

….

[Ramirez's counsel:] What went on for those 3 hours that you now tell us you sat there with your children?

[Megan's mother:] Talking to her, telling her that I was going to call the cops on her dad, and that he was going to be put in jail because I wasn't going to have him make me look like a fool anymore.

[Ramirez's counsel:] So you were going to do big payback, weren't you?

[Megan's mother:] Yes.

….

[Ramirez's counsel:] And you talked about seeing your husband when you made your first police statement wearing Dallas Cowboy shorts, pulling them up at the bedroom door when you walked in, right?

[Megan's mother:] I don't remember.

[Ramirez's counsel:] … [L]ook at … Exhibit 39 ….

[Megan's mother:] Okay.

23

[Ramirez's counsel:] What did you tell the police that [Ramirez] was wearing when you came in the house …?

[Megan's mother:]     Shorts.

….

[Ramirez's counsel:] Was he working on the car [earlier that day] wearing Dallas Cowboy shorts?

[Megan's mother:]     No, he had army pants on.

….

[Ramirez's counsel:] Is there truth to the statement you gave, Exhibit Number 39?

[Megan's mother:]     No.

….

[Ramirez's counsel:] You instructed the child what to say?

[Megan's mother:]     I don't remember.

[Ramirez's counsel:] Did you tell the child what to say if people asked her what happened?

[Megan's mother:]     At home, yes.

….

[Ramirez's counsel:] [Y]ou have never ever let her since that day talk to anyone, the police alone, the District Attorney alone, me alone, nobody; isn't that correct?

[Megan's mother:]     Yes, that is true.

[Ramirez's counsel:] Because you didn't want anyone to talk to that child alone because the truth would come out; isn't that correct?

[Megan's mother:]     I was afraid of that, yes.

(Emphasis added.)

¶47     The mother testified Ramirez was still sleeping in the bedroom when she and the children left to go to her mother's house. Cross-examination continued

with Ramirez's counsel asking again: "But you're testifying that you didn't put his sperm from a used condom on your child?" and Megan's mother responding, "No, I did not."

¶48    Megan's mother indicated that at the grandmother's residence, she took Megan into a back room and told her "[j]ust to say what I had told her to say at the house before getting to my mom's house," which was "[t]hat her dad had touched her in a way that he shouldn't have … [i]n her privates." She further testified that Larsen told them "that we had to go to the hospital. She would be examined because I was accusing him of a serious crime."

¶49    Ramirez's counsel asked, "Did you ever leave your husband alone with your daughter after taking [his uncle] home," to which Megan's mother responded, "No." Counsel then asked, "But you sit here today and testify you don't know how the sperm got on the kid's underpants?" Megan's mother responded, "No, I do not." Questioning continued:

> [Ramirez's counsel:]  But you sit here today and you tell us you told your daughter to lay down next to her [step-]father while her [step-]father is inebriated out cold on a bed?
>
> [Megan's mother:]     Yes, I did.

¶50    The mother agreed that when they returned to their residence the morning of September 6, 1999, Megan and her brother were "playing normally" and talked with Ramirez's brother, Angel, "like a regular day." Counsel continued: "Because they hadn't been traumatized by [Ramirez] the day before?" Megan's mother responded, "No." Megan's mother indicated that in the post-September 5, 1999 letters she wrote to the circuit court, she did not write the things about which she was testifying in court that day because she was afraid of being prosecuted for lying.

¶51    The mother indicated she and Ramirez had had sex the morning of September 5, and she put the used condom in the bathroom. When asked, "Did you touch that condom again," she responded, "No."[8]

¶52    Related to the November 8, 1998 incident, the mother indicated that when she came home from work that evening, she found Megan taking a bath.

> [Ramirez's counsel:] And when you came home and the child is in the bathtub, what do you see?
>
> [Megan's mother:]    She was taking a bath and I walked out of the room, but then she had screamed out for me to come to the bathroom. When I got in the bathroom she was standing in the bathtub and there was blood on the bathtub. She was bleeding.

The mother dressed Megan and took her to the hospital. Questioning about this injury continued:

> [Ramirez's counsel]: Did you look at all for anything that could have caused that?
>
> [Megan's mother:]    Well, there was blood on the bathtub. Our bathtub is a—like old fashioned and it has a hump, a lip, I don't know how to describe it. And there was blood all over the floor inside where she was trying to get out.
>
>     ….
>
> [Ramirez's counsel:] Did she tell you what happened?
>
> [Megan's mother:]    She said she was trying to get out of the bathtub and she slipped and hit herself in between her legs [on] the edge of the bathtub.
>
> [Ramirez's counsel:] That's what you're saying here today?

---

[8] We could find no evidence presented at trial indicating a used condom was found in the bathroom wastebasket or anywhere else in Ramirez's residence when evidence technicians searched it on September 5, 1999.

[Megan's mother:]     That's what she told me, yes.

¶53     The mother testified that Megan did not talk with anyone at the hospital and that the mother herself "really didn't even have a chance to talk to anybody." When counsel asked, "Don't you recall them asking if she was sexually assaulted and her denying it," the mother replied, "They never asked that." Counsel responded: "Mrs. Ramirez, they did ask it," but counsel withdrew the question following an objection by the prosecutor.

¶54     The mother indicated that after surgery, Schellpfeffer told her Megan was fine and that she asked him "if there's anything wrong," to which he said, "[N]o" and "he would see [Megan] in two weeks so he could re-check her." The mother again denied that anyone at the hospital expressed a concern that Megan may have been sexually assaulted.

¶55     When asked, "How can your children forget what you told them to do," she responded, "I don't think that they do. I'm sure they feel something every day, because their dad's not there." Testimony continued:

> [Ramirez's counsel:] … If [Megan] had been really sexually assaulted, would you have taken her for counseling and therapy?
>
> [Megan's mother:]     Yes.
>
> [Ramirez's counsel:]  But you didn't take her, did you?
>
> [Megan's mother:]     No.
>
> [Ramirez's counsel:]  Why?
>
> [Megan's mother:]     She didn't need to go to counseling.
>
> [Ramirez's counsel:]  Why?
>
> [Megan's mother:]     Because nothing happened.

¶56    Officer Kenneth Duffy testified that he was dispatched to Ramirez's residence on the night of September 5, 1999.  Upon entering the residence, he observed Ramirez to "appear[] to be sleeping on a couch" while holding a "large knife" in his hand with a wrench lying between his legs.  When another officer knocked the knife away, Ramirez was roused, Duffy announced they were police, and Ramirez resisted arrest with a struggle ensuing.  Kenosha Police Officer John Gray testified regarding evidence he recovered from Ramirez's residence the night of September 5, 1999, including "tissue paper … from the wastebasket in the bathroom," and two photos he took of a broken chain lock on the door to the residence.

¶57    A DNA analyst from the state crime lab testified to her testing of the underwear, toilet paper, and vaginal swabs/smear from the "rape kit."  Her testimony and report related to that testing indicated that Ramirez's semen and/or sperm cells were identified on each item.[9]

¶58    A pediatrician with the Child Protection Center of Children's Hospital of Wisconsin, Dr. Judy Guinn, testified that she does the "medical portion" of team assessments related to children who are suspected of being victims of abuse.  In cases of alleged sexual abuse, she does "a specialized examination of the genital and anal areas."  She confirmed she had been trained "in making a diagnosis in the

---

[9]  In *Ramirez v. Tegels*, 963 F.3d 604, 609 n.3 (7th Cir. 2020), the United States Court of Appeals for the Seventh Circuit summarized the DNA analyst's evidence this way:

> Specifically, there was a one in 20 trillion chance that the DNA evidence from the tissues and underwear belonged to a Hispanic male other than Mr. Ramirez, and a one in 400,000 chance that the DNA found on the vaginal swab belonged to a Hispanic male other than Mr. Ramirez.

Ramirez does not dispute that it was his semen/sperm found on Megan's vagina, underwear and the toilet paper.

28

difference between intentionally inflicted injury and an accidentally inflicted injury," adding that "[m]ost pediatricians receive some training in that area, but not as much training as a person who specializes in child abuse," such as herself.

¶59    Questioned about straddle injuries, which she described as occurring "when a person falls with their legs … spread open onto an object," Guinn explained that "the injuries you would expect to find in a straddle injury would be external, that means on the outside of the skin and usually … in the upper genital area … and … one sided."  Guinn had reviewed Schellpfeffer's report related to his November 8, 1998 treatment of Megan, and the report described Megan's vaginal injury as a "laceration extending up one-half the length of [her] vagina in the midline" and also indicated the "external genitalia" "appeared intact."  According to Guinn, the nature of Megan's injury was "inconsistent with a straddle injury" but was instead "penetrating trauma," because her injury was "inside the vagina.  So that means that object that penetrated would have to go through the hymen, through the hymenal opening and into the vagina.  So it's an internal injury and that means something had to penetrate inside."  The prosecutor noted Schellpfeffer's reference to the injury as "an episiotomy type injury," and Guinn expressed that this type of injury was "inconsistent with a straddle injury" and was "diagnostic for sexual abuse." The prosecutor asked if the injury would be consistent or inconsistent with the history "in this case" that in November 1998 Megan slipped and fell on the lip of the tub.  Guinn responded, "That would be inconsistent.  A mere slip and falling on the edge of the bathtub would not cause penetrating trauma such as was described in the medical records.  It would be a more external injury."  She testified that based upon the report, the cause of Megan's November 1998 injury "would have to be an object that is long enough to penetrate inside the vagina."  When asked "if a child were to state that her daddy had tried to insert his pee-pee inside of her, would the

injury that was described in Dr. Schellpfeffer's report be consistent or … inconsistent with that sort of a history," Guinn responded, "That would be consistent with that statement."

¶60 On cross-examination, Guinn read from the November 1998 ER notes, which indicated Megan "denie[d] that anyone touched her in that area." Guinn agreed the records from this ER visit indicated Megan had had a pap smear, but Guinn added, "a pap smear doesn't really look for sperm or semen. You would need to do a specialized sexual assault evidence kit." Counsel for Ramirez remarked about the injury being a "half inch tear going an inch up [the] vagina," stated that "[a] man's penis is usually bigger than a half inch wide," and asked Guinn, "wouldn't the tear be bigger than a half an inch on the outside." Guinn responded, "Not necessarily at all, no. Many times we see kids who have been sexually abused and have been penetrated and they show no injury."

¶61 When asked on redirect examination if there was anything about the statement in the November 1998 notes that "[m]other states that child slipped at the edge of an old bathtub with a curved lip and has been bleeding since" that changed her opinion "regarding the type of injuries that [Megan] suffered," Guinn responded, "No, I still stick with my original opinion." Guinn further testified that she had seen penetrating-type injuries to children "about 100 times" and in every instance, it was due to sexual abuse, adding, "If it's penetrating trauma that is consistent with sexual abuse. I have seen straddle injuries that were accidental, but those were not penetrating trauma." She stated again that "the injuries present on this exam are consistent with penetrating trauma into the vagina and with sexual abuse," and the findings "would be considered diagnostic of sexual abuse."

¶62    Schellpfeffer also testified for the State.  To ensure he testified, however, prior to the start of trial, the State had granted Schellpfeffer immunity related to his testimony.  Schellpfeffer required immunity because he feared that, as a statutorily mandated reporter of suspected child abuse, his testimony otherwise could be used to prosecute him for failing to report a suspected sexual assault of Megan following his treatment of her on November 8, 1998.  Ramirez requested to cross-examine Schellpfeffer about this grant of immunity, but the circuit court denied the request.

¶63    Schellpfeffer testified that he treated Megan in an ER on November 8, 1998.  He observed "active bleeding from the genital area" and "a laceration in [her] perineum, … [t]he area between her vagina and rectum."  He testified that "[t]he history that I obtained in the [ER] was that the mother was working and that [she] had been called from work to come to attend to this injury to her daughter, which was said to be a straddle injury on a bathtub."  He determined the injury was "not wholly inconsistent with the possibility of a straddle injury, but not at all typical of a straddle injury or straddle injuries that … I have taken care of."  "[D]epending upon what is straddled," he stated, "most straddle injuries … usually result[] in some type of external injury; either with a hematoma or collection of blood in the genital area, or some type of laceration to the external genitalia and possibly the internal genitalia."  In Megan's case, "there was no hematoma and no other evidence of external injury besides what I described in my dictation and in the questions you just asked."  Schellpfeffer said he had asked Megan's mother if Megan could have been sexually abused, and she responded, "No."

¶64    While operating on Megan, Schellpfeffer observed she had a "gaping cut," "very much like an episiotomy," in her lower vagina and perineum.  "The laceration into the vagina was approximately 2 to 2-and-a-half centimeters; and the

laceration into the perineum was approximately a centimeter." When asked if her injury was "consistent or inconsistent with a penetrating type injury," he responded, "It is certainly consistent possibly with a penetrating injury, yes." He noted that in his pre-operative notes, his assessment indicated "perineal laceration from straddle injury," but he added that the "straddle injury" portion was "based upon the history" given to him, not upon his observations of the injury. When asked hypothetically, "[I]f [Megan] had told you or some other person on November 8th, 1998 that this injury … was the result of her daddy putting his pee-pee inside of her, would this injury that you observed be consistent or inconsistent with that sort of process," Schellpfeffer responded, "It certainly would be consistent." When asked, "[T]he injury [Megan] suffered was more consistent with a sexual assault than with a straddle injury, wasn't it?" Schellpfeffer responded, "You're asking again the hypothetical, if there was the history of sexual assault … Yes." Schellpfeffer testified that the day after surgery, he again asked the mother "if there was any chance that [Megan] could have been sexually abused," and she responded, "No. There was no sexual abuse that she knew of." Schellpfeffer testified that he called Megan's pediatrician the Monday after the surgery and expressed his continued concern there may be sexual abuse, so the pediatrician could "follow[] up when he saw her."

¶65 On cross-examination, Schellpfeffer acknowledged he was aware that before he arrived in the ER, an ER nurse had asked Megan if anyone had "touched her in that area" and that she denied such had occurred. He agreed that "as a mandated reporter," if he "really had felt … [Megan] was evidencing sexual abuse or misuse … [he] would have reported it," but he did not report it "because [he] didn't believe that at that time." He agreed that he had done a pap smear and vaginal culture of Megan and found "no sperm or semen."

¶66   For Ramirez's case-in-chief, two of Ramirez's brothers, Carreon, and an uncle testified. His brother Marcus Nord testified that he was at Ramirez's residence earlier in the day on September 5, 1999, and Megan's mother was upset with Ramirez because he and the brother had both gotten "pretty drunk" while working on a truck. Ramirez was wearing "work pants" and boots.

¶67   Carreon testified that he was at Ramirez's residence on November 8, 1998, and Ramirez and the mother were getting Megan and her younger brother ready for a bath, so Carreon went back to his adjacent residence. Related to September 5, 1999, Carreon testified that on that day, Ramirez was working on his truck and wearing "work pants." At some point in the afternoon, Ramirez "passed out," and Carreon put him on his bed, where Ramirez "went back to sleep." Megan's mother "didn't like" that Ramirez was intoxicated, "but he was sleeping. She was satisfied with that, I guess." At some point, Carreon went to his residence and did not hear anything happening in Ramirez's residence until he heard police officers at Ramirez's door.

¶68   Ramirez's uncle, Diego Ramirez, testified that Ramirez was "completely drunk" on September 5, 1999. When Carreon brought Ramirez inside and put him on his bed, Megan's mother knew Ramirez was drunk, but she "was happy" nonetheless. Later that afternoon, Megan's mother drove Diego home, about a fifteen-minute drive from her residence.

¶69   Ramirez's brother Angel Ramirez testified that he was living with Ramirez on September 5, 1999. He indicated that if a person was standing outside of the door looking into the residence with the chain on the door, the person would not have been able to see the doorway to the bathroom, the "hall area between the bathroom and the children's bedroom," or into the children's bedroom doorway.

Referring to a photograph taken from the perspective of a person standing outside the door and looking into the residence with the door fully open, Angel agreed that the photo "doesn't show anything that would show any entrance to a child's room."

¶70     Angel further testified that when he returned to the residence around 5:00 p.m. on September 5, 1999, he observed Ramirez asleep in Ramirez's room, and Megan's mother "seemed like … she had an attitude or something." Angel left the residence around 7:00 p.m. and returned when Megan and her brother were watching cartoons the next morning. They appeared "[l]ike … average child[ren] watching cartoons," and neither child said anything to him about anything that had occurred the night before. Angel also testified that Megan's mother "was jealous of any women."

¶71     The jury found Ramirez guilty of the two November 8, 1998 sexual assault counts and the September 5, 1999 child enticement and sexual assault counts. After years of significant postconviction litigation, Ramirez's case landed back before the circuit court to decide whether Ramirez was entitled to a new trial on the basis that (1) his Confrontation Clause rights were violated by the admission at trial of Megan's and her younger brother's incriminating statements through other witnesses—and thus without Ramirez having the opportunity to cross-examine the children—and/or (2) Ramirez was not permitted to cross-examine Schellpfeffer in relation to the grant of immunity the State afforded him to ensure he testified. The court concluded Ramirez is entitled to a new trial on both grounds, and the State appeals.

### Discussion

¶72     As indicated, whether Ramirez is entitled to a new trial turns on two issues. The first is whether the following statements admitted at trial through

witnesses other than Megan or her brother were testimonial—thus implicating the Confrontation Clause—and, if so, whether their admission nonetheless was harmless: (1) Megan's statements to Halpin, Siegel and Larsen at the hospital on September 5, 1999, indicating Ramirez had engaged in sexual conduct with her that day and on November 8, 1998, (2) Megan's statements to Gregory at the police station on September 6, 1999, related to the same sexual conduct, and (3) Megan's younger brother's statements to Gregory at the police station on September 6, 1999. The second issue is whether the circuit court erred in precluding Ramirez from cross-examining Schellpfeffer regarding the immunity the State granted him for his testimony, and if the court did err, if such error violated Ramirez's right to a fair trial or was harmless. Because we conclude that (1) the statements in question were either nontestimonial or their admission at trial was harmless, and (2) even if the court erred in not allowing the requested cross-examination of Schellpfeffer, such error was harmless, we reverse the circuit court's order for a new trial and direct the court to reinstate Ramirez's amended judgment of conviction entered on October 29, 2013.

Relevant Law

¶73    We review independently whether a Confrontation Clause violation has occurred. *State v. Keller*, 2021 WI App 22, ¶18, 397 Wis. 2d 122, 959 N.W.2d 343. In *Keller*, we explained:

> [A] defendant's right to confrontation is violated if the [circuit] court receives into evidence out-of-court statements by someone who does not testify at the trial *if* those statements are "*testimonial*" and the defendant has not had "a prior opportunity" to cross-examine the out-of-court declarant…. "[C]onfrontation challenges begin with an analysis of whether the out-of-court statements used against a defendant are "testimonial." "*If the statements are not testimonial, the Confrontation Clause is not implicated*."

*Id.*, ¶19 (first alteration in original; third emphasis added) (quoting ***State v. Mattox***, 2017 WI 9, ¶24, 373 Wis. 2d 122, 890 N.W.2d 256). We further explained that

> "[i]n determining whether an out-of-court statement is testimonial, we must decide 'whether, in light of all the circumstances, viewed objectively,' the 'declarant is acting as a witness against the defendant ....'" ***State v. Nelson***, 2021 WI App 2, ¶29, 395 Wis. 2d 585, 954 N.W.2d 11 (citation omitted). We make such a decision "by considering whether the 'primary purpose' of the statement was to 'gather evidence for [the defendant's] prosecution' or 'substitute for testimony in a criminal prosecution.'" ***Id.*** (citation omitted). Factors relevant to our analysis include: "(1) the formality/informality of the situation producing the out-of-court statement; (2) whether the statement is given to law enforcement or a non-law enforcement individual; (3) the age of the declarant; and (4) the context in which the statement was given." ***Mattox***, 373 Wis. 2d 122, ¶32 (footnote omitted).

*Keller*, 397 Wis. 2d 122, ¶20 (second alteration in original).

¶74 If a circuit court erroneously permits admission of a testimonial out-of-court statement at trial, the error may nonetheless be harmless and thus not require reversal of the conviction. "An error is harmless if there is no reasonable possibility that the error affected the outcome of the trial." ***State v. Spencer***, 2022 WI 56, ¶39, 403 Wis. 2d 86, 976 N.W.2d 383 (citation omitted). It is the State's burden to establish beyond a reasonable doubt that an error is harmless; whether the State has done so is a question of law we review independently. ***State v. Ziebart***, 2003 WI App 258, ¶26, 268 Wis. 2d 468, 673 N.W.2d 369. "In determining whether an error is harmless, we weigh the effect of the [circuit] court[']s error against the totality of the credible evidence supporting the verdict." ***Id.***

Statements to Nurse Halpin and Dr. Siegel

¶75    Ramirez contends Megan's September 5, 1999 statements at the hospital were testimonial and thus implicate the Confrontation Clause. Considering the factors our supreme court laid out in *Mattox*, 373 Wis. 2d 122, ¶32, we conclude her statements to Halpin and Siegel were all nontestimonial and, thus, do not implicate the Confrontation Clause because they were made for the primary purpose of medical treatment, not "to 'gather evidence for [Ramirez's] prosecution' or 'substitute for testimony in a criminal prosecution.'" *See id.*, ¶¶32-33 (citation omitted).

¶76    Ramirez asserts that certain circumstances surrounding Megan's statements in the ER require a determination that the statements were testimonial: Larsen had told Megan's mother they "had" to go to the hospital and he drove Megan and her mother there; Larsen was present during some of Halpin's conversation with Megan in the ER and even himself engaged in some discussion with Megan, during which she made statements incriminating Ramirez; Megan's statements concerned incidents that had already occurred rather than a continuing safety threat; after Megan was discharged from the ER, Halpin provided the police with a written statement as to what had occurred in the ER; and samples taken from Megan's private areas were sent not only to the hospital lab but also to the "crime lab." While we consider each of these points, at the end of the day, we are guided by the direction our supreme court has provided in *Mattox* for analyzing such cases.

¶77    Related to the first testimonial/nontestimonial factor, in *Mattox*, our supreme court stated that the "typewritten, titled, and signed" nature of a toxicology report at issue in that case amounted to only "slight formality" and "d[id] not imply a testimonial purpose in a way that traditionally formal attestations, such as notarization or certification, might." *Mattox*, 373 Wis. 2d 122, ¶34. In *Nelson*, 395 Wis. 2d 585, ¶31, we stated, "The same [could] be said" of a medical report detailing

an examination conducted on a sexual assault victim, which report was, as we noted later in **Keller**, "typed and titled," *see* **Keller**, 397 Wis. 2d 122, ¶21. In **Keller**, we concluded that the "unsigned, untyped, untitled oral statements" confidential reporters in that case made to Child Protective Services workers related to the reporters' concerns for a child's welfare "do not even reach the level of 'slight formality' of the reports in **Mattox** or **Nelson**. *Id.*, ¶22. As to the second **Mattox** factor, the United States Supreme Court has plainly expressed that statements made to non-law enforcement individuals are "much less likely to be testimonial than statements to law enforcement officers." **Ohio v. Clark**, 576 U.S. 237, 246 (2015); *see also* **Mattox**, 373 Wis. 2d 122, ¶34.

¶78    In the case now before us, Megan's statements to Halpin and Siegel at the hospital were not written (much less signed and notarized) or made at a preliminary hearing, before a grand jury, at a former trial, at a police station or even *to* a police officer, even though Larsen overheard some of Megan's statements to Halpin. Rather, they were oral statements made by an eight-year-old girl directly to a nurse and doctor in connection with their examination of her in the ER of a hospital.

¶79    As to the third factor, Megan's age, Ramirez states that because Megan was eight years old at the time she made the statements, she "could reasonably be expected to know that statements to the police (and others to whom the police have directed them) can be used to secure criminal punishment." While we agree an eight-year-old child "could reasonably be expected to know" that statements he or she makes to the police in response to questioning "can be used to secure criminal punishment," we disagree that a child of that age would know that statements made to a nurse and doctor in an emergency room might later be used to secure criminal punishment against someone, even if a law enforcement officer

directs and drives the child to the hospital and is present in the room while one of the medical professionals questions the child. Furthermore, there is no indication in the record that when Megan made her statements to Halpin and Siegel during the examination, Megan—*the declarant*—would have had any idea that samples taken from her private areas might be sent to a "crime lab," or what that might mean, or that Halpin might later provide police with a written statement as to her and Siegel's conversation with Megan and the results of the examination.[10] Additionally, Megan's previous treatment by Schellpfeffer in the ER of the same private area of her body in November 1998 would only have underscored for Megan that Halpin

---

[10] In arguing that Megan's statements at the hospital were made for the primary purpose of prosecution of Ramirez and thus were testimonial, Ramirez states that her statements "made to [Halpin] were immediately memorialized and turned over to the police." The fact that Halpin provided the police with a written statement after Megan's discharge does not go far toward convincing us that Megan's statements at the hospital were made for the primary purpose of prosecuting Ramirez. At the time Halpin provided the written statement to police, like today, nurses and physicians were mandatory reporters and, as the relevant statute read at the time, they were required by law to "immediately inform" certain authorities "of the facts and circumstances contributing to a suspicion of child abuse" if they had "reasonable cause to suspect that a child seen in the course of [their] professional duties has been abused." *See* WIS. STAT. § 48.981(2), (3) (1999-00). One way in which a mandatory reporter could satisfy the reporting requirement under the statute would be to report the suspected abuse to a county social services, human services, or child welfare agency, WIS. STAT. §§ 48.981(3), 48.02(2g), 46.22, 46.23 (1999-00); another way would be to report the suspected abuse to "the sheriff or city, village or town police department." Sec. 48.981(3) (1999-00).

We note that failure of a nurse or physician to provide such information could result in criminal prosecution of the professional, with potential punishment including imprisonment of up to six months. WIS. STAT. § 48.981(6) (1999-00). Thus, the fact that Halpin provided a written statement to law enforcement related to the questioning and examination of Megan gives little indication Halpin and Siegel were questioning her for the primary purpose of securing evidence for Ramirez's prosecution as opposed to for the purpose of treating her, but simply indicates they were complying with their mandatory after-the-fact duty under the law and avoiding prosecution by doing so. Additionally, since the police were on site at the hospital on September 5, 1999, it would seem that providing them with the report would be the easiest way to satisfy the reporting requirement.

and Siegel were speaking with and examining her for the purpose of providing her medical care.[11]

¶80 As to the fourth factor—"the context in which the statement was given"—we have already touched upon that. Megan made her statements in an ER to two medical professionals who were clearly showing concern for her health and providing her with care. They began with a standard/generic medical examination before questioning and examining Megan specifically in relation to the alleged sexual assault from that day. Megan, and any other eight-year-old girl in her position, would have answered their questions believing that by doing so she was facilitating their efforts to address her health needs. *See Giles v. California*, 554 U.S. 353, 376 (2008) ("[S]tatements to physicians in the course of receiving treatment" generally will not be precluded by the Confrontation Clause.).

¶81 Considering the *Mattox* factors, we conclude that the statements Megan made to Halpin and Siegel were not made for the primary purpose of "gather[ing] evidence" for or "substitut[ing] for testimony in" a criminal prosecution. *See Mattox*, 373 Wis. 2d 122, ¶¶32-33. This is true even as to the statements about her November 8, 1998 hospital visit, by which she indicated her vaginal injury on that date was caused by Ramirez "trying to put his pee-pee inside

---

[11] The State highlighted this point at the postconviction hearing before the circuit court:

> [I]n November of 1998, [Megan] had been brought to the emergency room for medical treatment. And she answered questions there based on the questions asked to her by the ER nurse and by the ER doctor, and there was no officer in the room at that time. So [Megan], when she's answering these questions in September of 1999, is doing what she did in November of 1998, answering questions so that she can receive proper treatment inasmuch as an eight-year-old can imagine that. But she knows that when a doctor asks questions, you answer them, and when a nurse asks questions, you answer them because they're going to take care of you.

of her." These statements, too, were made for the primary purpose of facilitating her medical treatment on September 5, 1999.

¶82 Halpin testified that as a nurse, she takes care of children "for any type of medical or emotional problems" and that to properly treat a patient for a current condition, it is necessary to know relevant history. She explained that it was "part of [her] responsibility to obtain the history from a patient," adding that a nurse "need[s] a history to find out current events that are going on with the patient; their history in the past, past medical problems." A nurse tries to find out "what they've been treated for before, and what's been surrounding the current reason that they're in the emergency department." After obtaining the history, a nurse "document[s] it on the chart," "share[s] that with the physician," and then the nurse and physician "take care of the patient together."

¶83 This is just common sense and comports with common experience seeing medical professionals. Specific to child sexual abuse, when a child presents with alleged sexual abuse, certainly it is important for the medical provider to know if, how, and when the child may have been abused before in order to properly address the child's present physical and psychological health needs. *See Nelson*, 395 Wis. 2d 585, ¶35 (noting that a sexual assault victim's "mental health … understandably could be significantly compromised as a result of the assault"). Relatedly, it is relevant for the provider to inquire as to what treatment the child previously received for related medical concerns. Indeed, learning a young girl had been cut in her vaginal/perineum area months earlier due to her step-father "trying to put his pee-pee" inside of her would inform a nurse and doctor to ask related questions and consider examining the girl further to see if similar injuries had occurred in the present instance. It would be a poor medical professional indeed who upon a patient presenting medical complaints did not inquire about relevant

history. All of the statements Megan made to Halpin and Siegel were nontestimonial as they were made for the primary purpose of facilitating proper medical care for Megan, not prosecuting Ramirez, and the circuit court did not err in allowing their admission at Ramirez's 2001 trial.[12]

Statements to Officer Larsen and Detective Gregory

¶84 Megan's communications made directly to Officer Larsen at the hospital on September 5, 1999, and her and her brother's statements given to Detective Gregory at the police station on September 6, 1999, may stand on different footing as Larsen and Gregory were clearly engaged in investigating Ramirez for possible prosecution when they were questioning Megan and her brother. Ultimately, however, we need not decide if these statements were testimonial and erroneously admitted at trial because even if they were, their admission was harmless.

¶85 Larsen testified that using a Teddy bear he had given her, Megan "showed [him] on the … bear where daddy had touched her with his private," and as he was talking with Megan, she told him that Ramirez "had put her face down …

---

[12] Ramirez's contention that Megan's statements at the hospital were testimonial includes his brief assertion that "all the statements concerned incidents in the past, rather than an ongoing threat: Ramirez had already been arrested." In support of this assertion, he points to the federal district court's statements that Megan's statements "were not spontaneous and were not made in the context of an ongoing emergency." *Ramirez v. Tegels*, 413 F. Supp. 3d 808, 820 (W.D. Wis. 2019).

Regardless of spontaneity or an ongoing emergency, the ultimate question remains whether her statements were made for the primary purpose of "gather[ing] evidence" for or "substitut[ing] for testimony in" a criminal prosecution. *State v. Mattox*, 2017 WI 9, ¶¶32-33, 373 Wis. 2d 122, 890 N.W.2d 256. As that question relates to this case, we do not consider whether Megan's statements were made for the primary purpose of facilitating her immediate safety as opposed to the prosecution of Ramirez but whether they were made for the primary purpose of facilitating her health care as opposed to the prosecution of Ramirez. Thus, whether Ramirez had been arrested at the time Megan made her statements has little relevance to the particular consideration at issue here.

on the bed," "put his private by her pooh-pooh," and "when she went to the bathroom she went to wipe herself and there was brown stuff on there." Also, when Megan's mother informed Larsen that Megan had previously gone to the hospital for vaginal bleeding the mother believed was due to a bathtub fall, Megan interjected, "No, my daddy did it." Less clear is whether Larsen was indicating that Megan was talking to him, talking to the nurse, or talking to both of them when the prosecutor asked him if he "hear[d] any conversation between either [himself] and [the nurse] and [Megan] about any incident that occurred in November of 1998," and Larsen responded, "Yes. [Megan] also stated that when this happened before that it was her dad."

¶86    Gregory testified that Megan's brother told him he "s[aw] his dad take his shorts off" in the bedroom with Megan and saw "boogers" on the bed. And Megan told Gregory that after her mother left their residence, Ramirez separated her and her brother into different rooms, removed his shorts, had her face down with her clothes off, "laid on top of her," and "rubbed his private parts against her butt." Further, when Gregory asked Megan about her prior (November 1998) surgery, she responded, "Dad did it."

¶87    As to Megan's statements, Halpin's properly admitted testimony about what Megan said to her in the ER conveyed the same information regarding what Ramirez did to Megan both on November 8, 1998, and on September 5, 1999. Furthermore, Siegel also testified that Megan directly told her in the ER on September 5, 1999, that Ramirez "had put his pee-pee by her. And she pointed to her buttock area." Additionally, Megan's grandmother testified that while at the grandmother's house before going to the hospital on September 5, 1999, Megan told

her "that her daddy touched her bottom."[13] And as to Megan's statements to Larsen and both her and her brother's statements to Gregory, the totality of the evidence presented at trial was so extensive and compelling as to Ramirez's guilt on the charges on which he was convicted that we conclude beyond a reasonable doubt, there is no reasonable possibility the verdicts would have been any different if these statements had not been admitted at trial.

¶88    On September 5, 1999, semen was found on Megan's vaginal area, the crotch of her underwear, and the toilet paper found in the bathroom garbage can.[14] DNA testing showed, and there is no dispute, that it was Ramirez's semen. Importantly, there was no evidentiary basis for the jury to conclude its presence in these locations was due to anything other than what Megan told various individuals—reworded, that Ramirez had taken down Megan's pants and his own,

---

[13] This testimony by the grandmother has not been challenged, and no confrontation challenge would prevail as this statement by Megan was clearly nontestimonial; nothing indicates it was made for the primary purpose of prosecuting Ramirez. No police officer was present or involved in any way, and it was Megan's mother, not her grandmother, who eventually called the police. We see nothing suggesting either Megan or the grandmother were contemplating using this statement for future prosecution of Ramirez.

[14] Swabs taken from Megan's rectal area also showed the presence of semen.

laid her face down on a bed, put his penis on her buttocks, and eventually ejaculated on her.[15]

¶89    As to the November 1998 assault, Megan's statement to Halpin that her 1998 injury had not been caused by falling on the bathtub but was caused by Ramirez "trying to put his pee-pee inside" of her was consistent with both Siegel's and Guinn's testimony that if she had been injured by straddling an object such as a bathtub, Megan would have had external injuries, but no such injuries were reported in the relevant hospital records.  Moreover, related to her review of Schellpfeffer's report detailing Megan's November 1998 injury, Siegel testified that the injury was "pretty much diagnostic" for "sexual misuse" and not caused by falling straddle-style on the side of a bathtub, adding that she had "[n]ever seen an injury of the sort that was described by Dr. Schellpfeffer that was caused by *anything other than sexual misuse*." (Emphasis added.)  Guinn testified very similarly to Siegel, stating that the November 1998 records indicated Megan had been injured by "an object

---

[15] Although Ramirez's counsel repeatedly questioned Megan's mother in an attempt to produce evidence of an alternative manner in which Ramirez's semen could have gotten onto Megan, the mother consistently and unambiguously denied planting his semen on her.  Despite Ramirez's counsel arguing in closing that Megan's mother—or "somebody"—planted Ramirez's semen on Megan's body, no actual evidence of this was introduced nor was there evidence from which a reasonable inference of this could be made.  And, as the circuit court properly instructed the jury, it was to "decide the case solely on the evidence" and "remarks" and "arguments" of counsel are "not evidence."  *See Merco Distrib. Corp. v. O&R Engines, Inc.*, 71 Wis. 2d 792, 795-96, 239 N.W.2d 97 (1976) ("Arguments or statements made by counsel during argument are not to be considered or given weight as evidence.").  As the prosecutor stated in his closing argument, "smear[ing] her husband's semen on her daughter's body … would be the only explanation aside from him raping her that would cause … [Megan] to have the defendant's semen all over her buttocks, all over her vaginal area, on her legs, on her underwear, [and] on the [t]issue paper she used to wipe herself off."  Yet, there was no evidence that the mother did this, only speculative argument by Ramirez's counsel.  It was as to this key point the Court of Appeals for the Seventh Circuit went astray in its decision granting Ramirez habeas relief, because it relied in significant part upon the closing speculative *arguments* of Ramirez's defense counsel suggesting Megan's mother may have planted Ramirez's semen on Megan.  *See Ramirez*, 963 F.3d at 610, 618.  As indicated, however, there was no actual *evidence* of this presented nor evidence from which a reasonable inference of this could be made, so there was no factual basis by which any reasonable jury could conclude she planted his semen.

that is long enough to penetrate inside the vagina," consistent with a child stating a man had "tried to insert his pee-pee inside of her." Guinn added that Megan's 1998 injury was inconsistent with falling on the edge of a bathtub because such a fall "would not cause penetrating trauma such as was described in the medical records."

¶90 While it would have no doubt been difficult for the jury to discern what, if any, portions of Megan's mother's testimony should be believed, the mother testified that on September 5, 1999, Ramirez did not assault Megan but she had instructed Megan to say that he had. Significantly, however, we see no testimony indicating she had instructed Megan on what to say in relation to her *November 1998 injury*. Halpin testified that she asked Megan "if this was the first time something like this had happened," and Megan responded, "No." Megan's mother then asked Megan "if when she went to St. Catherine's for her vaginal bleeding did she really hurt herself on the bathtub. And she said: No, she hadn't," adding "that dad … was trying to put his pee-pee inside of her and that's how she got cut. That it wasn't the bathtub." When Halpin subsequently asked Megan why she had not previously told this to anyone, Megan told Halpin that Ramirez "had told her that if she told anybody about this that he would hurt her little brother, her mom or her grandma." Importantly, we see no testimony that would have given the jury any reason to believe the mother gave eight-year-old Megan advanced coaching on what to say if, by chance, she was asked a more nuanced question like this.

¶91 We further note that the mother appeared to slip up a bit with her recantation at trial. She testified at various points that she made up the September 5, 1999 sexual assault story and coached her children accordingly because she was angry at Ramirez either because (1) he was drinking heavily while the mother's family was visiting; (2) an old girlfriend had called asking for Ramirez and indicated she was supposed to meet him; (3) Ramirez and Megan's mother were "supposed

46

to go do something that afternoon"; or (4) a combination of these. However, at one point when asked by the prosecutor if it was true that "at the time you made this allegation about a sexual assault it was based … partly upon what you saw when you entered that residence," she responded, "No, I guess of *what I thought might have happened*, not of what I seen happen because I was not there." (Emphasis added.) So, with this she indicated that when she entered the residence, she "thought [something] might have happened," something that caused her to call the police and allege that Ramirez sexually assaulted Megan. But, if Ramirez was passed out when she left the residence and was still passed out when she returned to it and she then spent more than an hour watching television, as she also testified, and then decided to make up the sexual assault accusation and coach the children regarding that, why would she have "thought" anything "ha[d] happened"? Indeed, this may have been one of the few parts of the mother's testimony the jury actually believed—that she "thought" something of concern "ha[d] happened" based upon what she observed when she returned to the residence. No doubt the jury agreed the mother was angry with Ramirez when she called the police to allege a sexual assault by him, but this anger was because she indeed "thought" he may have assaulted Megan based upon what she had observed.

¶92    We cannot help but also point out that when the police went to search the residence and arrest Ramirez on September 5, 1999, he was sleeping on the couch with a large knife in his hand and a wrench between his legs—hardly a common sleeping manner. If the mother's recantation story was to be believed, as far as an inebriated Ramirez might have known, he had just been brought upstairs and laid on his bed earlier in the day by his cousin. There would have been no reason whatsoever for him to arm himself. Jurors would have had a hard time believing Ramirez went to sleep with these weapons just by chance or because he

47

routinely slept that way, which would have had to have been the case if they were to believe the mother's trial story that she made up all of the accusations and coached her children and that Ramirez, as she stated at one point, "didn't do anything."

¶93     Accordingly, we conclude beyond a reasonable doubt that there is no reasonable possibility the verdicts in this case would have been any different if the challenged testimony of Larsen and Gregory as to Megan's and her brother's statements had not been admitted at trial.

Grant of Immunity to Dr. Schellpfeffer

¶94     At a pre-trial hearing, Schellpfeffer testified that because he, as a physician, was a statutorily mandated reporter of suspected child abuse, he had felt "[s]ubtly" intimidated by comments the prosecutor in this case made to him on the date of Ramirez's preliminary hearing, which comments Schellpfeffer agreed "subtly implied [he] could be prosecuted" for having failed to report as suspected abuse the injury sustained by Megan on November 8, 1998.  Following the prosecutor's comments, Schellpfeffer retained legal counsel, and the State ultimately afforded him immunity related to his testimony in this case.

¶95     Ramirez and the State agree the circuit court erred in preventing him from cross-examining Schellpfeffer in relation to the State's grant of immunity to him in exchange for his testimony.  We assume without deciding that the parties are correct in this regard.  We agree with the State, however, that any error was harmless.

¶96     We are not convinced that attempted impeachment on this basis would have had any meaningful impact.  While it is the State's burden to show that the

jury would have returned the same verdicts even if Ramirez had been permitted to cross-examine Schellpfeffer related to the prosecutor's "subtl[e] impli[cation]" he could be prosecuted and the subsequent grant of immunity, Ramirez does not even attempt to develop an argument suggesting what impact such an impeachment effort might have had on the trial. He blames his inability to develop an argument on the circuit court "prevent[ing]" him at a pre-trial hearing "from delving into how the threat might have affected" Schellpfeffer. He states "we can't know" whether Schellpfeffer's testimony was "free of bias" and "we cannot know" if Schellpfeffer might "have testified any differently than he actually did." Instead of suggesting the types of questions that might have been asked of Schellpfeffer at trial in hopes they would bear fruit, Ramirez merely posits that "depriving the jury of this information meant the jury could not adequately assess Schellpfeffer's credibility, or his claims that he'd suspected sexual abuse that he did not report." Ramirez's effort, or lack thereof, on this issue is not particularly persuasive. That said, again, the State does bear the burden to show any error by the court was harmless. So, to that point, we consider the following.

¶97     Schellpfeffer's November 8, 1998 hospital report—which was made years before he was granted immunity by the State—indicates a nurse inquired of Megan's mother on that day and Schellpfeffer inquired of the mother the following day if Megan's vaginal injury was possibly due to abuse. The notes reflect that both times the mother denied this possibility. Thus, the notes show that Schellpfeffer suspected abuse as a possibility long before he received the State's grant of immunity.

¶98     When she was being treated for the September 5, 1999 assault, Megan informed Halpin that her previous vaginal injury had not been caused by falling on the edge of the bathtub but by Ramirez "trying to put his pee-pee inside of her,"

statements that were completely consistent with Schellpfeffer's medical findings identified in his report and Siegel's and Guinn's conclusions from the same. Relatedly, even if jurors questioned the veracity of Schellpfeffer's testimony on incriminating points, it would matter little because Guinn and Seigel both testified to the same key points related to the November 1998 assault:  the injury detailed in Schellpfeffer's report, which consisted of internal cuts yet no external injuries, would almost certainly have been caused by penetrative sexual abuse—not a straddle fall onto the edge of a bathtub.  As Guinn testified, "something had to penetrate inside," and as the State wrote in its reply brief on appeal, "once [Megan] disclosed that Ramirez [had] assaulted her, the bathroom-fall explanation ceased to be plausible."  And damningly, as already explained, Ramirez's semen was found on Megan's vaginal area ten months after the November 8, 1998 injury, and the only fact-based explanation for its presence was Megan's statement to various witnesses that Ramirez had sexually assaulted her.

¶99     We can envision no impeachment that would have had any possibility of changing the outcome of the trial.  Considering the totality of the evidence presented at trial, we are convinced beyond any reasonable doubt that there is no possibility any amount of impeachment of Schellpfeffer related to the grant of immunity would have altered the verdicts.  The jury properly found that Ramirez committed all four of the sexual offenses of which he was convicted.

*By the Court.*—Order reversed and cause remanded with directions.